1

2

3

4

5

6

7

8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11
PUMA SE, et al.,

CASE NO. 2:23-CV-00116-LK

Plaintiffs,

12
v.

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS
AND DENYING PLAINTIFFS'
ALTERNATIVE MOTION FOR
LEAVE TO FILE AN AMENDED
COMPLAINT

13
BROOKS SPORTS, INC.,

14
Defendant.

15

16      This matter comes before the Court on Defendant Brooks Sports, Inc.'s motion for

17 judgment on the pleadings on counts 1 through 4 of Plaintiffs PUMA SE and PUMA North

18 America Inc.'s complaint. Dkt. No. 141. Brooks argues that (1) the ornamental features of its

19 accused Aurora BL running shoe are not substantially similar to those of PUMA SE's '075 Patent,

20 and (2) PUMA SE is a nonexclusive licensee of the NITRO mark with no right to institute an

21 enforcement suit, or in the very least the licensor must be joined in the suit. The Court concludes

22 that PUMA SE's patent infringement claim survives dismissal, but purported licensor Lloyd IP

23 must be joined in the suit.

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 1

# I.   BACKGROUND

PUMA SE and Puma North America Inc. (collectively, "PUMA") are "world leaders in the sportswear industry." Dkt. No. 117 at 2 (claiming to be "one of the top five sportswear brands in the world by revenue"). Brooks likewise crowns itself a frontrunner in athletic clothing and specifically champions its development of new technologies for performance shoes. Dkt. No. 123 at 10 ("Brooks sells a complete line of high-end performance footwear, accessories, and apparel in more than 50 countries worldwide and holds the largest market share in adult running shoes in specialty and sporting goods stores in the United States."). The parties' dispute centers on two pieces of intellectual property: the NITRO mark and the '075 Patent. The Court recounts the facts relevant to each in turn.

## A.   The NITRO Mark

The parties dispute the extent of PUMA's rights in the NITRO mark. PUMA maintains that it "owns rights" in the mark and uses it "on and in connection with various footwear." Dkt. No. 117 at 3. PUMA SE submitted to the United States Patent and Trademark Office (the "PTO") two trademark applications (Serial Nos. 97171928 and 97975106) for use of the NITRO mark on footwear. *Id.* at 4; Dkt. No. 151 at 32; *see* Dkt. No. 1-2 at 2 (Application Serial No. 97171928, submitted December 2021, for use of the NITRO mark on running shoes, training shoes, basketball shoes, soccer shoes, golf shoes, and motorsport shoes). On October 3, 2023, the PTO registered Application No. 97171928 as U.S. Trademark Registration Number 7184055.[1] Brooks is currently challenging that registration. Trademark Trial and Appeal Board Proceeding No. 92084311,

---

[1] In January 2023, and in response to a Letter of Protest filed by Brooks and several other individuals and entities, the PTO's examining attorney issued a refusal of registration for Application Serial No. 97975106 because the applied-for NITRO mark was "merely descriptive" and "possibly generic." Dkt. No. 97 at 6–8. The refusal also proposed an identification amendment to avoid future refusal based on deceptiveness. *Id.* at 8–9. It is unclear what action PUMA SE thereafter took with respect to this application. PUMA SE's complaint, however, grounds its rights in its registered trademark. Dkt. No. 1 at 14; Dkt. No. 117 at 14.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 2

https://ttabvue.uspto.gov/ttabvue/v?pno=92084311. Brooks also contends that Lloyd IP, a third party, is the true owner of the mark, and that PUMA is a mere licensee without rights to sue, as discussed in greater detail below. Dkt. No. 141 at 34–38. The below shoe heel exhibits the NITRO mark:



Dkt. No. 117 at 3.

In November 2021, a PUMA employee attending a trade show in Texas noticed and photographed several Brooks advertisements that purportedly infringed the NITRO mark. *Id.* at 5 (photographs depicting advertisements at trade show). PUMA soon thereafter authored a letter to Brooks in which it described its "exclusive rights to use its NITRO mark in connection with footwear." *Id*. PUMA then "engaged with Brooks in an attempt to resolve the dispute amicably and avoid litigation," but to no avail. *Id*. Brooks apparently "refused the settlement terms" and instead "moved forward with an infringing advertising campaign that makes extensive use of" the NITRO mark. *Id.* at 5–8 (screen shots of Brooks' allegedly infringing advertisements and social media posts).

**B.    The '075 Patent**

PUMA SE is the owner by assignment of the entire right, title, and interest in the '075 Patent. Dkt. No. 117 at 9. Issued in September 2020, the '075 Patent protects the "ornamental design for a shoe" as depicted in the following eight figures:



Dkt. No. 1-4 at 2, 4–11;[2] *see* 37 C.F.R. § 1.153(a) ("No description, other than a reference to the drawing, is ordinarily required."). PUMA SE contends that, after the '075 Patent issued, Brooks released its Aurora BL running shoe and essentially "adopted every aspect" of the claimed patent design. Dkt No. 117 at 10 (alleging that the Aurora BL "has an overall appearance that is substantially the same" as the '075 Patent). The Aurora BL shoe is depicted below:



---

[2] PUMA's amended complaint references various exhibits that are not attached to the complaint. *See generally* Dkt. No. 117. For convenience, the Court references exhibits to PUMA's original complaint that are also in the publicly available record for the '075 Patent.

*Id.* at 10. The Aurora BL design is protected by U.S. Design Patent No. D987,240 (the "'240 Patent"), which the PTO issued in May 2023. *See* Dkt. No. 97 at 49–57 ('240 Patent and figures).[3]

## C.     This Lawsuit

PUMA sued Brooks in the Southern District of Indiana for (Count 1) trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a); (Count 2) design patent infringement under the Patent Act, 35 U.S.C. § 271(a); and (Count 3) common law trademark infringement and unfair competition. Dkt. No. 1 at 14–17. Brooks successfully moved to transfer the action to the Western District of Washington. Dkt. Nos. 38, 65–67. PUMA SE then obtained a federal trademark registration for NITRO and amended its complaint to add a claim for federal trademark infringement under 15 U.S.C. § 1114. *See* Dkt. Nos. 110, 117. Brooks counterclaimed. Dkt. No. 123. In addition to asserting 26 affirmative defenses, it seeks a declaratory judgment that (1) PUMA has no rights in the NITRO mark; (2) PUMA SE's federal trademark registration is invalid; (3) Brooks did not infringe the NITRO mark; (4) Brooks' Aurora BL shoe does not infringe the '075 Patent; (5) the '075 Patent is invalid; and (6) the '075 Patent is unenforceable due to inequitable conduct. *Id.* at 7–10, 67–73. Brooks also advances counterclaims against PUMA for abuse of process, unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), common law trademark infringement and unfair competition, and unfair competition under Section 19.86.020 of the Revised Code of Washington. *Id.* at 73–79.

Brooks then filed a Rule 12(c) motion for judgment on the pleadings. Dkt. No. 141.

---

[3] PUMA alleges that the Aurora BL "is now being sold in connection with infringing uses of [its] NITRO mark." Dkt. No. 117 at 9. Brooks disputes this, countering that the Aurora BL "is not part of the nitro-infusion advertising campaign that Puma has targeted." Dkt. No. 123 at 21. It also claims that its designer "came up with the design for the Aurora BL as early as October 2019." *Id.* at 22; *see also* Dkt. No. 141 at 9 (arguing that the Aurora BL "was designed before Puma's design patent published and is the subject of its own recently-issued design patent").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 5

1

## II.   DISCUSSION

2      Brooks' motion advances two arguments. First, Brooks contends that the Aurora BL's

3   ornamental features are so different from those protected by the '075 Patent that PUMA's design

4   infringement claim fails as a matter of law. *Id.* at 9 ("[T]he ornamental features of the Aurora BL

5   shoe are too different from those in Puma's design patent for an ordinary observer to believe they

6   are the same.").[4] Second, Brooks maintains that "Puma has no ownership rights" in the NITRO

7   mark and lacks standing to assert trademark and unfair competition claims under a trademark

8   license agreement with Lloyd IP. Dkt. No. 141 at 10. Should the Court disagree as to this latter

9   contention and decide not to dismiss PUMA's trademark and unfair competition claims, Brooks

10  alternatively urges the Court to find that Lloyd IP is "a necessary party that must be joined under

11  Rule 19." *Id.* at 38.

12     PUMA has also conditionally moved for leave to amend its complaint to add Lloyd IP as

13  a plaintiff in the event the Court agrees with Brooks' interpretation of the licensing agreement.

14  Dkt. No. 104 at 5; *see id.* at 17–35, 37–54 (proposed amended complaint and redlined version).

15  PUMA indicates that it will withdraw this motion if the Court denies Brooks' Rule 12(c) motion.

16  *Id.* at 5 n.1. The Court accordingly suspended briefing on PUMA's motion for leave to amend

17  pending resolution of Brooks' motion for judgment on the pleadings. Dkt. No. 107.

18     The Court first sets forth the applicable standard and delineates the scope of the record for

19  purposes of Brooks' Rule 12(c) motion. It then addresses PUMA SE's design patent infringement

20  claim before turning to the parties' arguments regarding PUMA's standing to enforce the NITRO

21  mark and PUMA's related motion for leave to amend its complaint.

22

23

24
---
[4] The Court denied Brooks' motion for leave to file a physical exhibit of the Aurora BL running shoe. Dkt. No. 109.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 6

1    **A.      Legal Standard**[5]

2           "After the pleadings are closed—but early enough not to delay trial—a party may move

3    for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is appropriate

4    "when, accepting all factual allegations in the complaint as true, there is no issue of material fact

5    in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United*

6    *States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (cleaned up). This standard is "substantially identical"

7    to Rule 12(b)(6)'s "because, under both rules, a court must determine whether the facts alleged in

8    the complaint, taken as true, entitle the plaintiff to a legal remedy." *Id.* (internal quotation marks

9    and citation omitted); *see also Snoqualmie Indian Tribe v. City of Snoqualmie*, 186 F. Supp. 3d

10   1155, 1161 (W.D. Wash. 2016) ("When a Rule 12(c) motion is used as a vehicle for a Rule 12(b)(6)

11   motion after an answer has been filed, or when it is functionally equivalent to a motion to dismiss

12   for failure to state a claim, the same standard applies to both.").

13          PUMA's complaint must therefore "contain sufficient factual matter, accepted as true, to

14   'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

15   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility requirement is

16   met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference

17   that the defendant is liable for the misconduct alleged." *Id.* This does not require "detailed factual

18   allegations." *Id.*; *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) ("Specific facts are

19   not necessary; the statement need only give the defendant fair notice of what the claim is and the

20   grounds upon which it rests." (cleaned up)). A complaint must, however, offer more than

21   conclusory allegations and a "formulaic recitation of the elements of a cause of action[.]" *Iqbal*,

22

23   _____

24   [5] The law of the regional circuit applies to matters of procedural law that do not implicate patent law; conversely, Federal Circuit law applies to issues unique to patent law. *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 7

556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And the district court is not obligated to "blindly accept" as true allegations that "are contradicted by uncontested facts set forth in (1) exhibits to the nonmoving party's pleading, (2) documents that are referred to in the non[]moving party's pleading, or (3) facts that are included in materials that can be judicially noticed." *Yang v. Dar Al-Handish Consultants*, 250 F. App'x 771, 772 (9th Cir. 2007).

## B.    Scope of the Record

District courts generally may not consider any material beyond the pleadings at this stage. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). And if a court does consider "matters outside the pleadings," it must treat the Rule 12(c) motion as one for summary judgment and give all parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). As suggested above, though, there are exceptions to this general rule. A district court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

The Court accordingly considers the prior art, photographs, and other depictions of the Aurora BL running shoe in the parties' briefing. *See, e.g.,* Dkt. No. 141 at 18–25, 31–33; Dkt. No. 151 at 13, 17–21; *see also Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 932 (Fed. Cir. 2014) (per curiam) (a district court may consider photographs of the accused product when their authenticity is not questioned); Dkt. No. 109 at 3–4 (previous order indicating that the Court could consider these images). The same goes for the USPTO administrative records relating to the parties' patents and the NITRO trademark. *See Anderson*, 570 F. App'x at 932 n.3 (a district court may take judicial notice of patents and patent applications); *Mayo v. Experian Info. Sols.*, No. 3:22-CV-05164-DGE, 2023 WL 346629, at *3 (W.D. Wash. Jan. 20, 2023), *appeal docketed*, No. 23-

35068 (9th Cir. Jan. 27, 2023) ("Matters of public record that may be judicially noticed include pleadings, orders, and other papers filed with the court or records of administrative bodies."). And last, the parties agree that the Court may consider the 2020 trademark license agreement between Lloyd IP and PUMA SE. Dkt. No. 151 at 31 ("[I]f the Court determines extrinsic evidence is necessary to resolve the standing issue, the Court may treat Brooks' 12(c) motion as a motion under 12(b)(1) and consider extrinsic evidence[.]"); Dkt. No. 152 at 20; *see* Dkt. No. 139 at 94–105 (2020 license agreement).

## C.      Count 2: Design Patent Infringement

PUMA SE alleges that Brooks' Aurora BL shoe infringes the '075 Patent "literally or under the doctrine of equivalents[.]" Dkt. No. 117 at 15.[6] It bases its claim in Section 271(a) of the Patent Act and seeks damages under Sections 284 and 289. Dkt. No. 117 at 15–16. PUMA SE identifies several ornamental features in the '075 Patent and contends that the Aurora BL shoe includes all of them:

> The solid lines of the '075 Patent define a midsole structure of a shoe, which includes a heel-end, bulbous region that extends beyond a periphery of a disclaimed

---

[6] There are two theories of patent infringement: literal infringement or infringement under the doctrine of equivalents. *Messerschmidt v. United States*, 29 Fed. Cl. 1, 51 (Fed. Cl. 1993). Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)); *see also Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1568 (Fed. Cir. 1996) ("Infringement under the doctrine of equivalents may be found where those limitations of a claim not found exactly in the accused device are met equivalently.").

For design patents, however, "the concepts of literal infringement and equivalents infringement are intertwined" such that some authorities question "whether there is any need to apply to designs the general distinction between literal infringement of a patent and infringement under the doctrine of equivalents." *Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 701 (Fed. Cir. 2014) (cleaned up); *see Chef'n Corp. v. Trudeau Corp.*, No. C08-01135-MJP, 2009 WL 1564229, at *5 (W.D. Wash. June 4, 2009) (noting that the applicability of the equivalents doctrine in the context of design patents "has been questioned," and that *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) "clarified the test for design patent infringement without articulating a separate test for infringement under the doctrine of equivalents"). This is because principles of equivalency are encompassed in the ordinary observer test (discussed more below). *Malibu Boats*, 739 F.3d at 701; *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1189–90 (Fed. Cir. 1988). A plaintiff therefore need not separately plead infringement under the doctrine of equivalents. *See Power Probe Grp., Inc. v. Innova Elecs. Corp.*, 670 F. Supp. 3d 1143, 1148–49 (D. Nev. Apr. 27, 2023) (collecting cases).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 9

upper when viewed from above. The solid lines of the '075 Patent further define midfoot and toe-end bulbous regions of the midsole that also extend beyond a periphery of the disclaimed upper when viewed from above. A claimed seam extends from a toe end to a heel end of the midsole structure along each of the bulbous regions along lateral and medial sides thereof. The Brooks[] Aurora BL includes all of the aforementioned claimed features of the '075 Patent, resulting in an overall appearance that is substantially the same in the eyes of the ordinary observer.

*Id.* at 10; *see id.* at 10–11 (side-by-side comparison of Aurora BL and figures 1, 3, 4, and 7). According to PUMA SE, an ordinary observer familiar with Aurora BL prior art "would recognize that Brooks' Aurora BL design has incorporated elements of the claimed design that depart conspicuously from the prior art, resulting in an overall design that is deceptively similar to the claimed design." *Id.* at 11; *see also id.* at 12–13 (depicting prior art).

Brooks counters that "[w]hen all aspects of the claimed design are considered, it is clear that the ornamental features of [the] Aurora BL and Puma's D075 Patent design are not 'substantially similar' such that an ordinary observer would be deceived into believing that the designs are the same." Dkt. No. 141 at 15.

The Court concludes that PUMA SE has stated a plausible claim for infringement, and the two designs are not so distinct or so plainly dissimilar as to warrant judgment in Brooks' favor at this phase of the case. *See Lights Out Prods., LLC v. Triller, Inc.*, No. 2:22-CV-00416-MCS-MAA, 2022 WL 2159278, at *2 (C.D. Cal. Apr. 27, 2022).

1. The Applicable Statutes

An entity is liable for patent infringement if it "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor[.]" 35 U.S.C. § 271(a); *see also id.* § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). A successful infringement plaintiff is generally entitled to "damages adequate to compensate for the

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 10

infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." *Id.* § 284. And when a design patent is infringed, the Patent Act provides an additional remedy:

> Whoever during the term of a patent for a design, without license of the owner, (1) applies the patented design, or any colorable imitation thereof, to any article of manufacture for the purpose of sale, or (2) sells or exposes for sale any article of manufacture to which such design or colorable imitation has been applied shall be liable to the owner to the extent of his total profit, but not less than $250[.]

*Id.* § 289.

### 2. Infringement Analysis

Unlike a utility patent, a design patent protects only "the nonfunctional aspects of an ornamental design[.]" *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995); *see* 35 U.S.C. § 171(a).[7] Any alleged similarity between the claimed design and accused product must therefore be based on the ornamental features of the claimed design. *OddzOn Prods., Inc. v. Just Toys*, 122 F.3d 1396, 1405 (Fed. Cir. 1997). Design patent infringement analysis is a two-step process: the district court (1) construes the design patent's claim to determine its scope and then

---

[7] A design patent may not claim a "primarily functional" design, *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 930 F.3d 1314, 1318 (Fed. Cir. 2019), or be "dictated by function," *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 80 F.4th 1363, 1380 (Fed. Cir. 2023); *see Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015) ("If a particular design is essential to the use of an article, it cannot be the subject of a design patent."). Brooks suggests in passing that it is "not clear whether *any* of the elements of the D075 Patent are ornamental as opposed to functional[.]" Dkt. No. 141 at 18. Although Brooks "accept[s] as true" PUMA SE's allegations about the ornamental features of the '075 Patent "[f]or purposes of the instant motion," it "does not concede" that the elements are in fact ornamental as opposed to functional, "and expressly reserves its right to dispute Puma's allegations." *Id.* at 18 n.4. Invalidity due to functionality is an affirmative defense to infringement, and the party asserting that defense must show invalidity of the design by clear and convincing evidence. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993). This is a "stringent" standard, *Ethicon*, 796 F.3d at 1328, and one that Brooks "cannot shoulder" at this nascent stage, *Deckers Outdoor Corp. v. Fortune Dynamic, Inc.*, CV-15-769-PSG-(SSx), 2015 WL 12731929, at *6 (C.D. Cal. May 8, 2015) ("Plaintiff is not required to allege that its patented design is non-functional because a design patent, by virtue of its registration, protects the non-functional aspects of useful articles and such a patent carries a presumption that it is valid."); *see also AirHawk Int'l, LLC v. TheRealCraigJ, LLC*, No. SACV-16-00624-JVS (KESx), 2016 WL 9584008, at *3 (C.D. Cal. Aug. 1, 2016) ("To the extent that the patents contain functional as well as ornamental features, this inquiry raises questions of fact that are not appropriate at the pleading stage.").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 11

(2) compares the claimed design and the accused product using the "ordinary observer" test. *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1341 (Fed. Cir. 2020).

### (a) Step One: Construing the '075 Patent

"In construing a design patent claim, the scope of the claimed design encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" *Contessa Food Prods., Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed. Cir. 2002) (quoting *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 104–05 (Fed. Cir. 1996)), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d at 678. A district court therefore typically defines the scope of a design patent by reference to the figures illustrated in the patent rather than descriptive language. *Curver Luxembourg, SARL v. Home Expressions Inc.*, 938 F.3d 1334, 1339 (Fed. Cir. 2019); *Malibu Boats*, 739 F.3d at 702. Indeed, the Federal Circuit has cautioned that "the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design." *Egyptian Goddess,* 543 F.3d at 679; *see also Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1302 (Fed. Cir. 2010) (cautioning district courts against "excessive reliance on a detailed verbal description" in design infringement cases because such reliance "risks undue emphasis on particular features of the design rather than examination of the design as a whole").

So too, here. The Court finds that a verbal description of the ornamental elements in the '075 Patent would not be helpful to the infringement analysis. *See Egyptian Goddess,* 543 F.3d at 679 (the district court is not obligated to issue a verbal description of the design "if it does not regard verbal elaboration as necessary or helpful"); *Crocs, Inc.*, 598 F.3d at 1302 ("In many cases, the considerable effort in fashioning a detailed verbal description does not contribute enough to the infringement analysis to justify the endeavor."). The eight figures printed above establish the scope of the '075 Patent. More specifically, the solid lines in those figures demarcate the

ornamental design being claimed, while the broken (or "dotted") lines represent features that are not part of the claimed design. *See Contessa*, 282 F.3d at 1378; *Fitness IQ, LLC v. TV Prods. USA, Inc.*, No. 10-CV-2584-H (WMC), 2011 WL 13356174, at *5 (S.D. Cal. Mar. 11, 2011). The Court notes that at the summary judgment phase, it will consider as part of this analysis any arguments Brooks advances regarding elements serving a functional rather than ornamental purpose. Dkt. No. 141 at 18 n.4; *see also Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed. Cir. 2010) ("[W]here a design contains both functional and non-functional elements, the scope of the claim must be construed in order to identify the non-functional aspects of the design as shown in the patent." (quoting *OddzOn Prods.*, 122 F.3d at 1405)).

### (b) Step Two: Applying the "Ordinary Observer" Test

In the second step, the patented and accused designs are compared for overall visual similarity. *Elmer*, 67 F.3d at 1577. Courts employ the "ordinary observer" test to do so. Under the ordinary observer test, infringement does not turn on "literal identity"; it requires "sufficient similarity" and asks "whether 'the accused design could not reasonably be viewed as so similar to the claimed design that a purchaser familiar with the prior art would be deceived by the similarity between the claimed and accused designs[.]'" *Malibu Boats*, 739 F.3d at 701 (quoting *Egyptian Goddess*, 543 F.3d at 683); *see* 35 U.S.C. § 289 (design infringement encompasses application of a patented design "or any colorable imitation thereof" to an article of manufacture for the purpose of sale). The patented design and accused product therefore need not be identical for there to be design infringement. *OddzOn Prods.*, 122 F.3d at 1405. Moreover, the hypothetical ordinary observer "is not an expert in the claimed designs, but one of ordinary acuteness who is a principal purchaser of the underlying articles with the claimed designs." *Ethicon*, 796 F.3d at 1337 (cleaned up).

When the claimed and accused designs are "sufficiently distinct" and "plainly dissimilar," the plaintiff fails to show substantial similarity as a matter of law. *Egyptian Goddess*, 543 F.3d at 678. When that is not the case, however, resolution of the substantial similarity question "will benefit from a comparison of the claimed and accused designs with the prior art[.]" *Id.* The ordinary observer test is therefore a two-tiered approach. The threshold inquiry asks "whether, without review of the prior art, the claimed and accused designs are sufficiently similar"; if so, "the next level entail[s] a comparison to the prior art." *Great Neck Saw Mfrs., Inc. v. Star Asia U.S.A., LLC*, 727 F. Supp. 2d 1038, 1052 (W.D. Wash. 2010); *see also Ethicon*, 796 F.3d at 1337 (comparing the claimed and accused designs with prior art "is beneficial only when the claimed and accused designs are not plainly dissimilar").

*(i)*  PUMA SE Has Pleaded Sufficient Similarity

The parties spar over what is required for a design infringement claim to survive the pleading stage. PUMA SE argues that dismissal is inappropriate unless it is obvious on the face of the pleadings that there is no infringement. Dkt. No. 151 at 8–9. According to PUMA SE, the plausibility standard "is a low bar" and it need only show "some similarity in the overall visual appearances" of the '075 Patent and Aurora BL. *Id.* at 9. Brooks counters that design patent claims are "routinely" dismissed on the pleadings and, in this case, PUMA SE's claim fails as a matter of law because the two designs are plainly dissimilar. Dkt. No. 152 at 6–7.

To plead design infringement, a plaintiff must (1) allege ownership of the patent; (2) name each defendant; (3) cite the patent that is allegedly infringed; (4) state the means by which the defendant allegedly infringes; and (5) point to the sections of the patent law invoked. *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357, 1362 (Fed. Cir. 2013); *see also K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1284 (Fed. Cir. 2013) (a patentee-plaintiff need only plead facts sufficient to place the alleged infringer on notice as to what it must defend). The Court

1  agrees that PUMA SE has met these five requirements. Dkt. No. 151 at 12. Because infringement

2  is a question of fact, *Richardson*, 597 F.3d at 1295; *Five Star Gourmet Foods, Inc. v. Ready Pac*

3  *Foods, Inc.*, No. 5:18-CV-2436-DDP (KKx), 2019 WL 1260634, at *3 (C.D. Cal. Mar. 18, 2019),

4  it is "generally inappropriate" for the district court to make the infringement determination at the

5  pleading stage "unless the claimed design and accused product are so plainly dissimilar that it is

6  implausible that an ordinary observer would confuse them[.]" *Enerlites, Inc. v. Century Prods.*

7  *Inc.*, No. SACV-18-839-JVS(KESx), 2018 WL 4859947, at *3 (C.D. Cal. Aug. 13, 2018).[8]

8          The only question at this stage is whether a side-by-side comparison of the '075 Patent

9  design and the Aurora BL shoe demonstrates a sufficient visual similarity that the ordinary

10  observer could plausibly confuse the two. *Five Star Gourmet*, 2019 WL 1260634, at *3; *Oakley,*

11  *Inc. v. Trillion Top Co. Ltd. LLC*, No. SACV-17-01580-AG (JCGx), 2018 WL 5099484, at *3–4

12  (C.D. Cal. June 4, 2018). The Court finds such similarity in this case. A side-by-side comparison

13  demonstrates that, when considered as a whole, the designs are similar in curvature and

14  symmetry—including "smooth, bulbous midsole designs that extend beyond the periphery of the

15  upper [disclaimed feature] with heel, midfoot, and toe-end bulbous regions." Dkt. No. 151 at 12

16  ("The smooth shapes of the overextending bulbous designs create a visual theme of an overly-

17  cushioned, futuristic, space-type shoe sole."). PUMA SE also claims that both designs "include a

18  seam extending from the toe end to the heel end along the medial and lateral sides of the bulbous

19  regions." *Id.* These features—especially the bulbous protrusions along both midsoles—create a

20  "visual theme" that "attract[s] the eye of the ordinary observer when viewing the overall effect of

21  the design[s]." *Crocs, Inc.*, 598 F.3d at 1306. This overall visual theme is sufficient for PUMA

22

23  ---

[8] This is not to suggest that a district court cannot find noninfringement as a matter of law at the pleading stage. *See*

24  *Performance Designed Prods. LLC v. Mad Catz, Inc.*, No. 16-CV-629-GPC (RBB), 2016 WL 3552063, at *7 (S.D. Cal. June 29, 2016) (collecting examples of dismissal).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 15

1   SE's infringement claim to survive the pleading stage.

| D'075 Patent | Aurora BL |
|---|---|
|  FIG. 1 |  |
|  FIG. 3 |  |
|  FIG. 4 |  |
|  FIG. 7 |  |

Dkt. No. 151 at 13. Brooks nonetheless identifies several differences in the two designs. It contends

that "the back[s], front[s], and particularly the bottom[s] of the designs of the ['075] Patent and

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 16

the Aurora BL are fundamentally different from one another." Dkt. No. 141 at 17. The Court

addresses these arguments in turn.

Brooks first disputes PUMA SE's suggestion that a seam extends from the toe to the heel

of the midsole in both designs: "The Aurora BL's seam does not extend across portions of its heel

where there are markings instead and the seam has several breaks along the side, including where

there is a gap between the front and back portions of the Aurora [BL] midsole." *Id.* at 18. Although

the break is more pronounced in the Aurora BL, it is plausible that an ordinary observer could fail

to distinguish between the feigned seam break in the '075 Patent and the "true" seam break in the

Aurora BL when viewing the two designs in their entirety.



*Id.*

Brooks next maintains that the two midsole designs are different because, while the Aurora

BL midsole is "decoupled" into a front and back region, the '075 Patent's midsole is "continuous."

*Id.* at 19. It further emphasizes that the Aurora BL has four "distinct" bulbous protrusions along

the midsole that increase in size from the toe to the heel while the '075 Patent has only three, with

two larger bulbous regions at the toe and heel "and a smaller one in the middle." *Id.*



*Id.* at 19–20. These distinctions are unpersuasive for similar reasons. That the Aurora BL has one more bulbous protrusion than the '075 Patent does not sufficiently detract from the overall similarity of the designs in the eyes of the ordinary observer, at least for purposes of the pleading stage.

Brooks also points to alleged differences in the bulbous protrusions of the two designs. It argues that "the claimed 'bulbous' regions of the D075 Patent are rounded on top, whereas the midsole of the Aurora BL is flat on top and creates a smooth curve." *Id.* at 20. The '075 Patent design, at least according to Brooks, "has a flat sole" while the Aurora BL's sole "curves upwards

1    such that the front and heel of the shoe do not touch the ground." *Id.* It attempts to highlight these

2    purported distinctions with the below labeled comparison:



*Id.* But those differences are too granular to create plain dissimilarity at this stage. The bulbous

regions in both designs—whether "rounded on top" or "flat on top"—create a "visual theme" that

"attract[s] the eye of the ordinary observer" enough to render confusion plausible. *Crocs, Inc.*, 598

F.3d at 1306.

Next, Brooks relies on "lines running perpendicular to the 'seam' to create a cross pattern,

additional breakages between bulbous regions, and distinctive 'nitrogen-injection' site markings

on the side of the heel in lieu of any seam[.]" Dkt. No. 141 at 21.



*Id.*; Dkt. No. 1-4 at 4. As with the other distinctions Brooks relies on, these likewise fail to offset

the overall similarity between the two designs—at least at this nascent stage. The "cross pattern"

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 19

produced by the perpendicular lines along the Aurora BL's midsole is less pronounced in photographs than it is in the computer-generated image above. And for the reasons already discussed above, it is plausible that an ordinary observer could fail to distinguish between the feigned seam break in the '075 Patent and the "true" seam break in the Aurora BL. Nor does the "nitrogen-injection" logo render infringement implausible. A would-be infringer cannot escape liability by labeling a copied design with its own name. *See Columbia Sportswear*, 80 F.4th at 1370. And while the Federal Circuit has suggested that logo placement and appearance can in some circumstances render an accused design dissimilar to the patented one as a matter of law, *id.* at 1383, the logo in this case does not sufficiently disrupt the overall similarities such that infringement is no longer plausible.

Brooks also challenges the similarities between the soles of the two designs. It argues that the '075 Patent has "a continuous sole, with a rounded heel, and three symmetrical and rounded sections." Dkt. No. 141 at 22. The bottom of the Aurora BL, in contrast, "shows two large, irregularly-shaped pieces, and a bulky irregularly-shaped heel." *Id.*



ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 20

| D075 Patent | Aurora BL |
|---|---|

Rounded heel and three raised sections of sole

Irregularly shaped heel and decoupled flat midsole

*Id.* at 22–23. The Court agrees that there are differences in the sole designs. Most notable are the irregularly-shaped portions of the Aurora BL sole. *Id.* at 22–23; *see also id.* at 33 (Figure 7 of the '240 Patent).[9] The Aurora BL's sole is divided into two sections by a serpentine gap, and the divot in the heel creates a slightly different contour than the heel in the '075 Patent design. There are, however, similarities between the sole bottoms. The middle and toe regions of the Aurora BL's sole bottom are divided by a slight dip between the second and third bulbous protrusions. This gives an impression similar to the gap between the middle and toe pieces of the '075 Patent design. And the contours of the two sole bottoms overall are very similar. At this stage of the case, the differences in the soles are not enough to render the designs plainly dissimilar when, as it must, the Court considers the designs as a whole.

---

[9] Brooks argues that the PTO's issuance of the '240 Patent "provides further reason to conclude that Puma's design patent claim fails as a matter of law." *Id.* at 33. Although the grant of a separate patent on the accused device is "entitled to due weight," it does not automatically avoid infringement or equate to noninfringement as a matter of law. *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1191–92 (Fed. Cir. 1996). So too, here. The PTO's issuance of the '240 Patent does not negate its similarities to the '075 Patent or render PUMA SE's design infringement claim implausible.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 21

1    Beyond this, Brooks claims that the heels of the designs are "completely different" and

2    share no ornamental elements. Dkt. No. 141 at 24. It notes that, with respect to the Aurora BL,

3    "the area where the sole meets the upper part of the . . . shoe is convex," whereas that same feature

4    is concave on the claimed design. *Id.*



*Id.* Although the Court acknowledges this difference, it is not enough to reach plain dissimilarity.

The same goes for the Aurora BL's "hoof-like" heel, which differs from the "smooth rounded

heel" of the '075 Patent. *Id.*



*Id.* This distinction does not mean that "there are no shared ornamental design elements" in the

heel regions. Dkt. No. 141 at 24. The heels still have a sufficiently similar shape in the context of

the whole design. Which leads to the fundamental flaw in this and many of Brooks' arguments:

such a siloed focus elides the relevant inquiry. "[T]he fact finder must apply the ordinary observer

test by comparing similarities in overall designs, not similarities of ornamental features in

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 22

isolation. An element-by-element comparison, untethered from application of the ordinary observer inquiry to the overall design, is procedural error." *Ethicon*, 796 F.3d at 1335; *see also, e.g.*, *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 990–91 (Fed. Cir. 1993) (the district court erred by focusing its infringement analysis on a "single difference" in the heel pieces of the shoe designs). The Court cannot say that the Aurora BL's heel is so distinct that the designs are, overall, plainly dissimilar.

Brooks' final argument dies on the same hill as the others. It emphasizes that Figure 2 (a front view) of the '075 Patent reveals just one visible bulbous region "lying flat on the ground" along with "the distinctive claimed seam." Dkt. No. 141 at 25. Meanwhile, the front of the Aurora BL "shows at least two bulbous regions, raised from the ground" as well as the "distinctive 'cross' pattern." *Id.*



*Id.* This too places undue emphasis on minute distinctions in one or two elements with no mention of their role in or effect on a holistic comparison of the designs. The differences between Figure 2 and the front of the Aurora BL do not render the two designs plainly dissimilar.

The Court emphasizes that the pleading stage is not the time for resolving factual disputes. The sole question is, again, whether the two designs are sufficiently similar to render the

infringement claim plausible—not probable. PUMA SE's claim is plausible in this case. Brooks' piecemeal cataloguing of every distinction is unavailing at the pleading stage. Although the Court acknowledges the distinctions highlighted by Brooks and discussed at length above, those differences are insufficient to render the '075 Patent and Aurora BL so plainly dissimilar that the ordinary observer inquiry and, by extension, infringement, must be resolved in Brooks' favor now. The Aurora BL embodies the overall effect of the '075 Patent in sufficient detail that ordinary observer confusion is at least plausible. *See Crocs, Inc.*, 598 F.3d at 1306. Puma has therefore "complied with Rule 8, stated the correct law, and showed plausible entitlement to relief." *Hall*, 705 F.3d at 1364.

A survey of the caselaw compels this conclusion. As suggested above, the standard for surviving the pleading stage accounts for the fact-intensive nature of the ordinary observer test. District courts tend to let design infringement claims survive the pleading stage even when there are dissimilarities in the designs or doubts as to whether the ordinary observer would ultimately find sufficient similarity. *See, e.g.*, *Wahl Clipper Corp. v. Conair Corp.*, No. 23-114-JCG, 2023 WL 7298939, at *2–3 (D. Del. Nov. 6, 2023) (finding sufficient similarity to render infringement plausible; although some features were "not identical," whether the differences in symmetry and curvature were sufficient to render the claimed design and accused product distinct in the eyes of the ordinary observer presented an issue of fact), *report and recommendation adopted*, 2024 WL 474437 (D. Del. Jan. 16, 2024); *Five Star Gourmet*, 2019 WL 1260634, at *3 (finding that "some dissimilarities between the claimed design and the accused design" did not amount to "plain dissimilarity"); *AirHawk Int'l*, 2016 WL 9584008, at *3 (denying motion to dismiss where the "side-by-side comparisons show[ed] that the overall shape[s] of the patented and allegedly infringing products [were] identical").

1    This is so even when the differences are arguably more than minor. *See, e.g.*, *Lights Out*

2    *Prods.*, 2022 WL 2159278, at *2 (although there were differences between the claimed design and

3    accused product, "including the lack of a door in the accused product, an apparent difference in

4    height between the claimed product and the accused product, and different visual design for the

5    corners of the two products," those differences did not "make the overall designs so plainly

6    dissimilar that it [was] implausible an ordinary observer would confuse them"); *Benebone LLC v.*

7    *Pet Qwerks, Inc.*, No. 8:20-CV-00850-AB (AFMx), 2020 WL 8732321, at *4–5 (C.D. Cal. Sept.

8    3, 2020) (denying motion to dismiss where accused bone chew toy "ha[d] three-pronged ends with

9    slight tapering, whereas the [claimed patents] present[ed] two-pronged ends with no tapering").

10    Resolution at the pleading stage is reserved for obvious cases where the dissimilarities

11    clearly render the designs (as a whole) dissimilar. *See, e.g.*, *Anderson*, 570 F. App'x at 933 (plaintiff

12    failed to plausibly plead infringement where the differences between the accused products and

13    patented design were "markedly apparent"); *Colida v. Nokia, Inc.*, 347 F. App'x 568, 570–71 (Fed.

14    Cir. 2009) (per curiam) (plaintiff's claims were "facially implausible" because the dissimilarities

15    between the claimed designs and accused phone "far exceed[ed] the similarities"); *NuVasive, Inc.*

16    *v. Alphatec Holdings, Inc.*, No. 18-CV-347-CAB-MDD, 2018 WL 2734881, at *4 (S.D. Cal. May

17    14, 2018) (finding "obvious differences" between the claimed design and accused products that

18    rendered the designs "so plainly dissimilar that no ordinary observer would be deceived");

19    *Performance Designed Prods. LLC v. Mad Catz, Inc.*, No. 16-CV-629-GPC (RBB), 2016 WL

20    3552063, at *4–6 (S.D. Cal. June 29, 2016) (plaintiff's infringement claim was facially implausible

21    given the "numerous differences" between the claimed design and accused product "when viewing

22    the design as a whole"; noting that "it would be clear to an ordinary observer that the two designs

23    are 'plainly dissimilar'"); *SCG Characters LLC v. Telebrands Corp.*, No. CV-15-00374-DDP

24

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
COMPLAINT - 25

(AGRx), 2015 WL 4624200, at *5 (C.D. Cal. Aug. 3, 2015) (dismissing infringement claim where patented designs and accused designs "share[d] essentially no similarities").

> (ii) The Court Declines to Engage in a Full Comparison of the Designs with Prior Art

Comparison of the claimed and accused designs with prior art is "usually inappropriate" at the pleading stage. *Lights Out Prods.*, 2022 WL 2159278, at *2–3 (declining to engage in "intensely factual" task of comparing the claimed design, accused design, and prior art on motion to dismiss). Restraint is particularly appropriate when the defendant has not produced evidence of prior art, or the parties have not adequately addressed the issue. *See Great Neck Saw Mfrs.*, 727 F. Supp. 2d at 1052 n.7 (the accused infringer bears the burden of producing the prior art when it relies on such art as part of its defense (citing *Egyptian Goddess*, 543 F.3d at 678)); *Deetsch v. Lei*, No. 22-CV-1166-RSH-BLM, 2023 WL 6373073, at *5 (S.D. Cal. July 21, 2023) (declining to examine prior art where defendants failed to introduce such evidence); *Five Star Gourmet*, 2020 WL 513287, at *9 ("[T]he parties have presented competing factual descriptions that the court is not equipped to resolve based on the papers before it—especially given that familiarity with the prior art is potentially relevant to the determination, and the parties have not adequately addressed its impact.").

Here, Brooks dedicates roughly two pages to prior art. Dkt. No. 141 at 31–33. Its reply brief likewise contains a short discussion about prior art mixed in with arguments on plain dissimilarity. Dkt. No. 152 at 12–14. As for PUMA SE, it spends roughly three and a half pages discussing prior art, and about half of those pages are comprised of images. Dkt. No. 151 at 17–21. The Court declines to compare the '075 Patent and Aurora BL with prior art at this stage. Suffice it to say that although Brooks' characterizations of and limited arguments on the prior art weaken PUMA SE's case for infringement, they do not overcome the Court's finding of sufficient

similarity—at least, again, at the pleading stage. *See Deetsch*, 2023 WL 6373073, at *5; *Lights*
*Out Prods.*, 2022 WL 2159278, at *2–3. PUMA SE's design infringement claim remains plausible.

Brooks' motion is denied with respect to Count 2 of PUMA SE's complaint.

**D.      Counts 1, 3, and 4: Trademark Infringement and Unfair Competition**

Brooks next argues that PUMA lacks standing to enforce the NITRO mark because it is a
nonexclusive licensee under the 2020 agreement with Lloyd IP—the purported owner of global
rights to the mark. Dkt. No. 141 at 36–38; *see* Dkt. No. 139 at 94 (license agreement identifying
Lloyd IP as the licensor and "owner of the 'NITRO' trademarks on a global basis"). Brooks further
contends that the license agreement grants Lloyd IP the exclusive right to bring infringement
enforcement actions. Dkt. No. 141 at 35–38. Brooks alternatively asks the Court to join Lloyd IP
as a necessary party under Rule 19. *Id.* at 38–39. The relevant provisions of the license agreement
are as follows:

> 2.1 <u>License</u>. At the terms and subject to the conditions of this Agreement, [Lloyd
> IP] grants to [PUMA SE], and [PUMA SE] hereby accepts, a non-exclusive
> worldwide license to use the Licensed Trademarks [i.e., "the 'NITRO' trademarks
> owned by [Lloyd IP], which registrations cover 'footwear' or 'shoes' as products
> as well as any future trademark applications and registrations of the same type"] to
> design, manufacture and distribute inclusive of the respective on- and offline
> marketing of the Licensed Products [i.e., "any kind of footwear, excluding shoes or
> footwear used for motorcycling or motorsport activities"] and relevant Sales
> Materials during the Term of this Agreement [i.e., from November 2, 2020 "for an
> indefinite period until effectively terminated in accordance with the provisions of
> this Agreement"]. . . .

> 3.1 <u>Trademark Registrations</u>. [Lloyd IP] represents and warrants (a) that the
> Licensed Trademarks are in full force and effect in the Territory [i.e., "worldwide"],
> and (b), that it will maintain and defend the Licensed Trademarks throughout the
> Territory during the Term of this Agreement at its own cost in accordance with the
> provisions of clause 3.6. . . .

> 3.3 <u>Ownership of Licensed Trademarks</u>. [PUMA SE] acknowledges that the
> Licensed Trademarks are the sole and exclusive property of [Lloyd IP] and that all
> rights and goodwill arising from the use of the Licensed Trademarks by [PUMA
> SE] hereunder shall vest solely to the benefit of [Lloyd IP]. [PUMA SE] agrees that
> it will not acquire any ownership or other rights resulting from [PUMA SE]'s

performance or breach of this Agreement or its use of the Licensed Trademarks during the Term.

3.4 <u>Protection of the Licensed Trademarks by [PUMA SE]</u>. [PUMA SE] will not, at any time during the Term, take any action to challenge, hinder or impede [Lloyd IP]'s right to register the Licensed Trademarks in any country in the world. In particular, [PUMA SE] will not . . . do anything, including by any act or omission, which may (a) impair the validity of the Licensed Trademarks; (b) adversely affect [Lloyd IP]'s present or future registration thereof; (c) challenge the exclusive ownership thereof, interest therein or rights to the use thereof by [Lloyd IP]; or (d) injure the business or goodwill.

3.5 <u>Notification of claims</u>. [PUMA SE] will promptly inform [Lloyd IP] if and when it becomes aware of (a) any infringement or unfair competition affecting the Licensed Trademarks; (b) any use of or applications for, a trademark that conflicts with or is confusingly similar to the Licensed Trademarks; (c) any allegations or claims, whether or not made in legal proceedings, that the use of the Licensed Trademarks by [PUMA SE] infringes a trademark or other rights of any other entity; and to provide [Lloyd IP] with all relevant information in its possession with respect thereto.

3.6 <u>Control of Actions</u>. [Lloyd IP] shall take whatever action it considers necessary or desirable to protect the validity and strength of the Licensed Trademarks. In respect of any claims referred to in clause 3.5, [Lloyd IP] shall, in its absolute discretion, decide what action if any to take. It shall have exclusive control over, and conduct of, all claims and proceedings; and [Lloyd IP] shall bear the cost of any proceedings and shall be entitled to retain all sums recovered in any action for its own account. In such event, [PUMA SE] agrees to use its reasonable efforts to assist [Lloyd IP] at [Lloyd IP]'s expense.

Dkt. No. 139 at 94–97, 100, 104.

PUMA insists that the license agreement is a red herring. In PUMA's view, "the scope of the License Agreement d[oes] not include any United States rights. Instead, the License Agreement cover[s] the European trademark registrations that Lloyd IP owned in 2020 and future trademark applications or registrations." Dkt. No. 151 at 33. PUMA maintains that Lloyd IP is not a necessary party; however, it agrees that "adding Lloyd IP is a reasonable solution to continue the case if the Court has any doubt about PUMA's standing." *Id.* at 36.

"To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that [it] is either (1) the owner of a federal mark registration, (2) the owner of an

unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark." *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008) (citing 15 U.S.C. §§ 1114(1) and 1125(a)).[10] The second and third categories are based in Section 1125(a)(1), which provides a cause of action to "any person who believes that he or she is or likely is to be damaged" by the infringing acts identified in the statute. PUMA advances claims under both Section 1125(a)(1) and 1114(1). Dkt. No. 117 at 14–15, 17–18.

The Court declines to construe the license agreement in Lloyd IP's absence. Under Federal Rule of Civil Procedure 19, Lloyd IP is a required party if "in [its] absence, the court cannot accord complete relief among existing parties," or Lloyd IP "claims an interest relating to the subject of the action and is so situated that disposing of the action in [its] absence may . . . impair or impede [its] ability to protect the interest" or leave PUMA or Brooks "subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). To determine whether an absent person should be joined to an action, a court may consider evidence outside the pleadings. *See McShan v. Sherrill*, 283 F.2d 462, 464 (9th Cir. 1960).

Here, PUMA claims certain rights in NITRO based on its "ownership and exclusive use in commerce of the NITRO mark" predating Brooks' use, Dkt. No. 117 at 14, and has also registered that mark with the PTO, *id.* at 8. *See also id.* at 4 ("PUMA has developed substantial and valuable goodwill in its NITRO mark[.]"). Its license agreement with Lloyd IP provides that "all rights and goodwill arising from the use of the [NITRO] Trademarks by [PUMA SE] hereunder shall vest solely to the benefit of [Lloyd IP]," and prohibits PUMA SE—a non-exclusive licensee—from "tak[ing] any action to challenge, hinder or impede [Lloyd IP]'s right to register the [NITRO]

---

[10] The Ninth Circuit has suggested that the Lanham Act's standing requirements apply to common law trademark infringement. *Halicki*, 547 F.3d at 1225 n.5; *see also Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1219 (10th Cir. 2004) ("The elements of common law trademark or service mark infringement are similar to those required to prove unfair competition under [Section 1125(a).]").

Trademarks in any country in the world." Dkt. No. 139 at 96–97. The agreement further emphasizes that PUMA SE "will not acquire any ownership or other rights resulting from [its] performance or breach of this Agreement or its use of the [NITRO] Trademarks during the Term." *Id.* at 96. A decision that Lloyd IP does not have rights in NITRO in the United States would certainly impair or impede its ability to protect those rights. Conversely, the possibility that Lloyd IP has such rights could leave PUMA or Brooks subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations. *See Lee v. Anthony Lawrence Collection, L.L.C.*, 47 F.4th 262, 266–67 (5th Cir. 2022) (concluding that absent entity was a required party where, among other things, the plaintiffs' claims required them to "prove their ownership of the mark," and the absent entity's potential ownership of common law rights in the mark "reveal[ed] the ownership dispute lurking beneath the surface"), *cert. denied*, 143 S. Ct. 1054 (2023).[11] The Court therefore concludes that Lloyd IP is a required party.

As for Rule 19(b), it appears from the parties' briefing that it is feasible to join Lloyd IP. *See* Dkt. No. 104; Dkt. No. 151 at 36–37.

### III.   CONCLUSION

Brooks' motion for judgment on the pleadings is GRANTED IN PART and DENIED IN PART. Dkt. No. 141. The Court DENIES Brooks' motion to dismiss Count 2 but GRANTS Brooks' motion to join Lloyd IP as a necessary party.

---

[11] The Court further notes that the license agreement contains a foreign choice-of-law provision: "This Agreement . . . and any dispute or claim arising out of or in connection with it or its subject matter or formation . . . shall be governed by and construed in accordance with the law of England and Wales." *Id.* at 103. The parties sprint past this issue and appear to proceed under the mutual assumption that Washington law, rather than the law of England and Wales, applies to the license agreement. *See* Dkt. No. 151 at 32 (citing Washington law on contract interpretation); Dkt. No. 152 at 21–22 (same). The Court notes that "the law of the forum determines the standards of proof of the content of foreign law, as well as the effect of a party's failure to show the content of foreign law." *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1001 (9th Cir. 2006). And under Washington law, a party seeking to invoke foreign law has the burden of proving its substance. *See B.C. Ministry of Health v. Homewood*, 970 P.2d 381, 384 (Wash. Ct. App. 1999). It is entirely possible that Lloyd IP would prefer that the Court follow the law of England and Wales in construing the license agreement—yet another issue arising from its absence from the case.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT - 30

1    Because PUMA's "Alternative Motion for Leave to File an Amended Complaint" was

2    based on a now-superseded version of PUMA's complaint, *see* Dkt. No. 117, and because the

3    proposed complaint relies on decisions this Court has not issued, *see, e.g.*, Dkt. No. 104 at 40–41,

4    the Court DENIES the motion without prejudice.[12]

5    Given Lloyd IP's pending joinder, the Court VACATES the current scheduling order, Dkt.

6    No. 149, with the exception of the deadlines imposed in its Order on Brooks' Motion to Strike

7    Plaintiffs' Surrebuttal Expert Reports, Dkt. No. 153 at 9. The parties are DIRECTED to meet and

8    confer and file a Joint Status Report proposing a modified scheduling order no later than June 4,

9    2024.

10    Dated this 14th day of May, 2024.

11

12    Lauren King
      United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24   [12] The Court cautions PUMA that it must clearly state in any future amended complaint which entity is bringing a
     specific claim.

     ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE
     PLEADINGS AND DENYING PLAINTIFFS' ALTERNATIVE MOTION FOR LEAVE TO FILE AN AMENDED
     COMPLAINT - 31