UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PUMA SE et al., <br><br> Plaintiffs, <br><br> v. <br><br> BROOKS SPORTS, INC., <br><br> Defendant. | CASE NO. 2:23-cv-00116-LK <br><br> ORDER GRANTING MOTION TO COMPEL |

This matter comes before the Court on the motion of Plaintiffs PUMA SE and PUMA N.A. ("PUMA") to compel production of certain documents redacted and withheld by Defendant Brooks Sports, Inc. Dkt. No. 169; *see also* Dkt. No. 171 (sealed version). For the following reasons, the Court grants PUMA's motion.

## I. BACKGROUND

The Court adopts the factual background articulated in its May 14, 2024 Order, Dkt. No. 154 at 2–5, and its August 8, 2024 Order, Dkt. No. 188 at 1–3, with the additional relevant facts below.

ORDER GRANTING MOTION TO COMPEL - 1

A.  **Brooks' Retention of and Relationship with Third-Party Agencies Huge, Jellyfish, BibRave, and Curiosity**

Brooks retains third-party agencies "to provide advertising and marketing services[.]" Dkt. No. 196 at 1. During the relevant time period, these agencies included Huge, Jellyfish, BibRave, and Curiosity. *Id.* Brooks worked with these four agencies to develop and implement campaigns, including the "Run on Nitro" campaign advertising Brooks' nitro-infused shoes that was conceived in 2020 and launched in 2022. *Id.* at 2.

Brooks retained advertising agencies Huge and Jellyfish "to explore, develop, prepare, and produce creative marketing content," including aspects of the "Run on Nitro" campaign. *Id.* Huge and Jellyfish "were responsible for developing the creative content, marketing tactics, and asset development" for that campaign. *Id.* Jellyfish focused on the portion of the campaign directed towards the Caldera trail-running shoe, while Huge handled the other shoes that were part of the campaign. *Id.* Brooks also worked with Curiosity (a social media agency) and BibRave (a marketing agency) on the "Run on Nitro" campaign. *Id.* at 3. Brooks required all four of these agencies to keep the substance of their work for Brooks confidential pursuant to non-disclosure agreements. *Id.*

When Brooks' in-house legal department provides guidance regarding marketing materials and campaigns, that advice is communicated—typically by Brooks' internal marketing team—to any third-party agencies whose campaigns are affected by that guidance. *Id.* During the "Run on Nitro" campaign, Brooks' in-house legal department provided guidance about Brooks' use of the word "nitro," which was subsequently communicated by Brooks' marketing team to the third-party agencies. *Id.* at 4; *see also* Dkt. No. 198 at 2. When the third-party agencies proposed certain changes or asked questions that required legal consultation or sign-off, Brooks' marketing team would relay those proposals and questions to Brooks' in-house legal department. *Id.*

ORDER GRANTING MOTION TO COMPEL - 2

B.  **Brooks' Claims of Privilege and the Parties' Communications**

On May 3, 2024, Brooks produced a privilege log to PUMA that "identifie[d] a number of communications and documents shared between Brooks non-attorney employees and third parties not employed by Brooks during the relevant periods." Dkt. No. 170 at 2. These third parties included employees of Huge, Jellyfish, BibRave, and Curiosity. *Id.*

PUMA wrote to Brooks a week later on May 9, 2024, claiming that Brooks' assertion of attorney-client privilege in connection with third-party communications was improper and requesting that Brooks produce unredacted versions of the improperly redacted and withheld documents. *Id.*; *see id.* at 65–66. Brooks did not respond to this letter, and PUMA followed up on May 16, 2024. *Id.* at 3; *see id.* at 44–45. PUMA was still awaiting Brooks' response when it deposed Brooks employee Carlee Bickley on May 21, 2024. *Id.* at 3. During her deposition, she confirmed that Huge, Inc., Jellyfish, BibRave, and Curiosity are outside advertising agencies that Brooks hired for advertising campaigns. *Id*. Brooks produced a revised privilege log on May 22, 2024. *Id.*; *see id.* at 63–79. This log listed at least 60 communications exchanged with third party marketing agencies as either withheld or redacted based on attorney-client privilege. *Id.* at 63–79.

On May 29, 2024, PUMA informed Brooks during a meet and confer that it would be filing the instant motion along with a motion for relief from the Court's March 11, 2024 deadline to file motions related to liability discovery. *Id.* at 3; *see also id.* at 123. Brooks responded that it would oppose PUMA's motions. *Id.* at 3; *see also id.* at 123. Brooks produced another revised privilege log on June 11, 2024 that still asserted privilege in connection with at least 50 third party communications. *Id.* at 3; *see also* Dkt. No. 170 at 81–102.

On July 5, 2024, PUMA filed both motions, as well as a related motion to seal. *See* Dkt. Nos. 166–67, 169, 171. After the Court granted PUMA's motion for relief from the discovery motions deadline, Dkt. No. 188, Brooks filed its response to PUMA's motion to compel, as well

as a motion to seal exhibits attached to its response, Dkt. Nos. 194–95, 199–200.[1] The Court subsequently ordered Brooks "to submit for in camera review unredacted versions of all communications at issue," Dkt. No. 206, which Brooks did on September 16, 2024.

## II. DISCUSSION

### A. Legal Standard

Where, as here, a plaintiff's complaint raises both federal question claims and pendent state law claims, and the evidence at issue relates to both kinds of claims, the federal law of privilege applies. *Wilcox v. Arpaio*, 753 F.3d 872, 876 (9th Cir. 2014); *Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005); *see also* Fed. R. Evid. 501, Advisory Committee Notes (1974) ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply.").

Under Federal Rule of Civil Procedure 26, parties may generally "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" Fed. R. Civ. P. 26(b)(1); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005). "When a party withholds information otherwise discoverable by claiming that the information is privileged . . . , the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed," and must "do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 16(b)(5)(A); *Intermec, Inc. v. Int'l Bus. Machs. Corp.*, No. C11-0165-JCC, 2011 WL 13229254, at *2 (W.D. Wash. July 7, 2011).

"A party asserting the attorney-client privilege has the burden of establishing the existence of an attorney-client relationship *and* the privileged nature of the communication." *United States*

---

[1] The Court will address the parties' motions to seal in a subsequent order. Dkt. Nos. 166, 194.

ORDER GRANTING MOTION TO COMPEL - 4

*v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (cleaned up). Courts "strictly construe[]" the privilege "[b]ecause it impedes full and free discovery of the truth[.]" *Id.* (quoting *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009)). The attorney-client privilege governs where:

> (1) . . . legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Id.* (quoting *Ruehle*, 583 F.3d at 607). "The party asserting the privilege bears the burden of proving each essential element." *Id.* (quoting *Ruehle*, 583 F.3d at 608).

**B.  The Court Assumes Without Deciding that the Communications at Issue Contain Legal Advice**

PUMA contends that the documents at issue "are not properly maintained as privileged because they were not for the purpose of providing legal advice." Dkt. No. 169 at 13. Specifically, PUMA points out that "all but one of the emails at issue do not even include—by cc or otherwise—anyone Brooks identifies as counsel, much less pose a legal question or convey information with a clear purpose to obtain legal advice." *Id.* at 14. PUMA surmises that they are simply "ordinary business communications" that are not protected. *Id.* Brooks counters that "an attorney need not be copied on communications for privilege to attach," and the redacted and withheld emails at issue here "cover legal advice originating from Brooks' counsel shared with Brooks' marketing employees, and [the third-party agencies], or requests to seek legal advice from counsel, as detailed in Brooks' privilege log and accompanying declarations" that "were treated confidentially by the" third-party agencies. Dkt. No. 195 at 11.

The Ninth Circuit has recognized that "some communications might have more than one purpose[.]" *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2022). Whether a communication involving both legal and business purposes is protected by attorney-client privilege depends on "whether the primary purpose of the communication is to give or receive legal advice, as opposed

ORDER GRANTING MOTION TO COMPEL - 5

to business . . . advice." *Id.* at 1091–92. "Where the communications reflect discussions between in-house counsel and operational employees, this inquiry requires special consideration because counsel may be called upon to act as a business or strategic, as well as a legal, adviser." *Garner v. Amazon.com, Inc.*, C21-0750-RSL, 2024 WL 4266665, at *1 (W.D. Wash. Sept. 23, 2024) (citation omitted). "Thus, when attempting to demonstrate that an internal communication involving in-house counsel deserves privileged status, a party must make a clear showing that the speaker made the communication for the purpose or providing *legal* advice." *Id.* (cleaned up); *see also Dolby Lab'ys Licensing Corp. v. Adobe Inc.*, 402 F. Supp. 3d 855, 865 (N.D. Cal. 2019) ("[A]ttorney declarations generally are necessary to support the designating party's position in a dispute about attorney-client privilege." (collecting cases)).

Additionally, "a corporation's privilege extends to communications between corporate employees and corporate counsel as long as the communications are made at the direction of corporate superiors in order to secure legal advice." *United States v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010) (internal quotation marks and citation omitted); *see also United States v. Upjohn*, 449 U.S. 383, 390–94 (1981). Courts in the Ninth Circuit have determined that "the attorney-client privilege is not lost where non-attorney employees engage in communications primarily for the purposes of transmitting information to legal counsel so they may provide legal advice or disseminating information from legal counsel to the employees of the corporation." *Stevens v. Corelogic, Inc.*, No. 14-cv-1158-BAS (JLB), 2016 WL 397936, at *7 (S.D. Cal. Feb. 2, 2016); *see also Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 515 (S.D. Cal. Nov. 3, 2003) (finding documents protected by the privilege when it was "apparent that the communication from one employee to another was for the purpose of the second employee transmitting the information to counsel for advice" (quoting *Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 203 (E.D.N.Y. 1988)); *MGA Enter., Inc. v. Nat'l Prods. Ltd.*, No. CV 10-07083 JAK (SSx), 2012 WL 3150532, at *4 (C.D. Cal. Aug.

2, 2012) ("It is well accepted that in the case of a corporate client, privileged communications may be shared by non-attorney employees in order to relay information requested by attorneys." (cleaned up)).

After its *in camera* review of the communications at issue, the Court finds PUMA's arguments persuasive with respect to several of the documents. However, it assumes without deciding that all disputed communications contain legal advice.

### C. The Redacted and Withheld Communications at Issue are Not Privileged Because the Third-Party Agencies Are Not Functional Brooks Employees

"Generally, an attorney-client communication made in the presence of, or shared with, a third party is not confidential and therefore not privileged." *Klein*, 2022 WL 767096, at *4. Thus, even if the contents of the redacted and withheld emails contain or reflect legal advice, they are not protected unless the third-party agencies involved are the "functional equivalent" of Brooks employees.

Brooks maintains that the attorney-client privilege "extends to Brooks' advertising agencies under the well-recognized 'functional equivalent' doctrine in the Ninth Circuit[.]" Dkt. No. 195 at 2, 5–9. Under the "functional equivalent" doctrine, the attorney-client privilege covers "communications between a corporation's attorney and independent contractors or consultants who are the 'functional equivalent' of corporate employees." *Nat'l Prods. Inc. v. Innovative Intelligent Prods. LLC*, No. 2:20-cv-00428-DGE, 2023 WL 6215296, at *4 (W.D. Wash. Sept. 25, 2023) (quoting *Graf*, 610 F.3d at 1156, 1158–59). Because the privilege extends to communications with middle-level and corporate-level employees, the privilege also extends to "nonemployees who possess a significant relationship to the client and the client's involvement in the transaction that is the subject of legal services." *In re Bieter Co.*, 16 F.3d 929, 937–38 (8th Cir. 1994) (cleaned up; citing *Upjohn*, 449 U.S. at 391); *see also Graf*, 610 F.3d at 1159 (finding the

ORDER GRANTING MOTION TO COMPEL - 7

reasoning in *Bieter* persuasive and adopting its principles in the Ninth Circuit). "[T]oo narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely." *Graf*, 610 F.3d at 1158 (quoting *Bieter*, 16 F.3d at 937–38).

Although the Ninth Circuit has "not limit[ed] courts to any specific test or set of factors to use when evaluating whether [an outside employee] is a 'functional employee,'" *United States v. ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. 2:16-cv-08697-FMO (SSx), 2022 WL 22568965, at *3 (C.D. Cal. July 27, 2022); *see also Planned Parenthood Fed. of Am., Inc. v. Ctr. for Med. Prog.*, No. 16-cv-00236-WHO (DMR), 2019 WL 1950381, at *5 (N.D. Cal. May 1, 2019), courts have concluded that "[t]he dispositive question is the individual's relationship to the company, and whether he or she possesses information about the company that would assist the company's attorneys in rendering legal advice." *Nat'l Prods.*, 2023 WL 6215296, at *4 (internal quotation marks and citation omitted); *Klein v. Meta Platforms, Inc.*, No. 20-cv-08570-JD (VKD), 2022 WL 767096, at *4 n.3 (N.D. Cal. Mar. 11, 2022); *Digital Mentor, Inc. v. Ovivo USA, LLC*, No. 2:17-cv-01935-RAJ, 2020 WL 550746, at *2 (W.D. Wash. Feb. 4, 2020). In other words, "[t]o qualify as a functional employee . . . it is not sufficient to merely be an outside consultant hired in connection with a litigation." *Resolute Forest Prods. v. Greenpeace Int'l*, No. 17-cv-02824-JST(KAW), 2022 WL 885368, at *3 (W.D. Wash. Mar. 25, 2022). For instance, in *Graf*, the Ninth Circuit determined that an outside consultant was a functional employee because he was "heavily involved in all facets of the company's operations"; he "regularly communicated with insurance brokers and others on behalf of [the company], marketed the company's insurance plans, managed its employees, and was the company's voice in its communications with counsel." 610 F.3d at 1153, 1157; *see also, e.g., Poehling*, 2022 WL 22568965, at *1 (finding that third-party

ORDER GRANTING MOTION TO COMPEL - 8

government subcontractor's role "reflects none of the factual characteristics courts typically highlight in finding functional employee status," including unfettered access to systems and records, authorization to speak on company's behalf, physical location at company's offices, and direct supervision by the company over his work).

Accordingly, "a detailed factual showing is necessary to demonstrate that a third party is the functional equivalent to the corporation's employee." *RSA Protective Techs., LLC v. Delta Scientific Corp.*, No. CV 19-6024-JAK (PLAx), 2020 WL 12182967, at *3 (C.D. Cal. Dec. 14, 2020) (internal quotation marks and citations omitted); *see also, e.g.*, *Digital Mentor*, 2020 WL 550746, at *2 ("There is no documentation of [the consultant's] duties vis-à-vis [the company] or its corporate counsel, nor does the record demonstrate that [the consultant] had specialized knowledge such that counsel would rely on him to facilitate legal advice for the company."); *Planned Parenthood*, 2019 WL 1950381, at *6–7 (declining to find that consultants were functional employes based on limited information in declarations submitted by defendant); *United States v. Lonich*, No. 14-cr-00139-SI-1, 2016 WL 1733633, at *7 (N.D. Cal. May 2, 2019) (holding defendant had not met his burden to establish that individuals were functional employees because defendant "offered little information regarding the roles these individuals played with respect to [the corporation], far from what the courts relied on to make a 'functional employee' finding in *Bieter* and *Graf*").

Here, Brooks argues that its relationship with the third-party agencies "readily satisfies the functional equivalent doctrine" because the agencies "worked as an extension of Brooks' in-house marketing department, conceiving of campaign headlines, advertisements and copy, and deploying and executing certain campaigns." Dkt. No. 195 at 7. In its supporting declaration, Brooks avers that it has "worked closely with the [third-party agencies] to develop and implement campaigns, including the 'Run on Nitro' campaign that was conceived in 2020 and ran in 2022 and advertised

1   Brooks' nitro-infused shoes" and "integrated [the agencies] into the day-to-day workflow of
2   Brooks' marketing team." Dkt. No. 196 at 2. Specifically, Brooks contends that its "integrated
3   marketing team brief[ed Huge and Jellyfish] on the goals of a campaign, and then the agencies
4   [we]re responsible for developing a creative platform and thereafter executing all aspects of the
5   campaign." *Id.* at 2. Brooks' marketing team then "advise[d] and g[ave] feedback on these
6   campaigns, working side by side with Huge and Jellyfish as if they were extensions of the Brooks'
7   marketing department." *Id.* It also avers that Curiosity and BibRave "played a key role in major
8   marketing campaigns for Brooks, including the Run on Nitro campaign," and "BibRave acted as
9   an extension of Brooks' influencer marketing team." *Id.* at 3. The agencies were required "to keep
10  the substance of their work for Brooks confidential." *Id.* They were also privy to guidance from
11  Brooks' in-house counsel regarding Brooks' use of the word "nitro" after the dispute with PUMA
12  began in December 2021, and would propose certain changes and ask questions that Brooks'
13  marketing team "would take back to Brooks' legal department for guidance," the answers to which
14  were subsequently relayed back to the agencies. *Id.* at 3–4.

15      The conclusory assertions in Brooks' supporting declaration are not enough to demonstrate
16  that the employees at all four of the agencies were "functional employees" of Brooks that enjoy
17  attorney-client privilege with Brooks' counsel. First, Brooks includes only the statement of work
18  outlining Huge's responsibilities in 2022, but no documentation indicating the scope of work and
19  responsibilities for any of the other three agencies or for Huge in years other than 2022. *See* Dkt.
20  No. 199; *see also* Dkt. No. 196 at 1 ("Huge worked with Brooks from 2019 to 2022."). Therefore,
21  despite Brooks' contentions, there is insufficient evidence to demonstrate that all four agencies
22  "possessed a significant relationship with [Brooks]" of a nature warranting application of the
23  attorney-client privilege. *Nat'l Prods.*, 2023 WL 6215296, at *5; Dkt. No. 195 at 9.

24      Second, while Brooks may have had final approval of the agencies' work and collaborated

ORDER GRANTING MOTION TO COMPEL - 10

with the agencies as if they were extensions of the Brooks' in-house teams, these facts alone are not sufficient to meet the standard required for a third-party employee to be deemed a "functional equivalent" of an actual employee. For instance, in *Medversant Technologies, L.L.C. v. Morrisey Associates, Inc.*, the court affirmed a magistrate judge's conclusion that a third-party public relations firm was a functional employee in part because the firm "essentially function[ed] as [the company's] public relations department" and the company's attorneys "had been in contact or communication with [the public relation firm's] personnel for purposes of reviewing and providing legal advice regarding the content of [the company's] press releases." No. CV09-05031 MMM (FFMx), 2011 WL 13124128, at *1, 4–5 (C.D. Cal. July 20, 2011). By contrast, Brooks concedes here that the agencies did not communicate directly with Brooks' in-house counsel, but rather went through Brooks' in-house marketing department, which exhibits an attenuated relationship between the agencies' employees and Brooks dissimilar from that of standard Brooks employees. Dkt. No. 196 at 4. Furthermore, Brooks provides no evidence that the agencies had "access to confidential systems and information and to secure facilities" or "independent interactions with [Brooks'] business executives," *Klein*, 2022 WL 767096, at *6, represented Brooks publicly, *id.*, or "provide[d] information to [Brooks' in-house counsel] to aid [counsel] in advising [Brooks]," *Schaeffer v. Gregory Vill. Partners, L.P.*, No. 13-cv-04358-JST, 2015 WL 166860, at *4 (N.D. Cal. Jan. 12, 2015). In sum, Brooks does not provide sufficient evidence that there was anything particularly unique about its relationship with the third-party agencies that differed from an ordinary third-party consulting or contracting relationship such that application of the attorney-client privilege is warranted.

Because Brooks has not demonstrated that the third-party agencies are the "functional equivalent" of Brooks employees, the communications between its employees and the agencies'

employees are not protected by the attorney-client privilege.[2] And because Brooks' employees expressly waived any privilege connected with the communications at issue when they voluntarily shared the communications with the agencies, *see Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003), the information need only be relevant—not vital—to PUMA's case to be discoverable, Fed. R. Civ. P. 26(b)(1). During discovery, PUMA sought documents related to Brooks' decision to use NITRO in advertising campaigns, guidance Brooks created concerning such use, communications with any third party regarding PUMA's use of NITRO, and Brooks' knowledge of PUMA's use of its NITRO mark. Dkt. No. 170 at 3–4, 153, 165, 168, 170, 172, 184. Given PUMA's claims that Brooks knowingly and willfully infringed PUMA's trademark, Dkt. No. 187 at 15, 18, 21, the responsive communications at issue meet the "low bar" of relevance for discovery purposes, *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021). That those communications may not ultimately prove liability or be admissible at trial, *see, e.g.*, Fed. R. Evid. 407, is not material for purposes of Rule 26(b)(1); "[r]elevant information for the purposes of discovery is information reasonably calculated *to lead to the discovery of admissible evidence*." *Surfvivor Media, Inc.*, 406 F.3d at 635 (emphasis added and internal quotation marks and citation omitted).

### D.     PUMA is Permitted to Depose a Knowledgeable Witness About the Documents

Finally, PUMA requests permission to depose Bickley or another witness with similar knowledge regarding the documents at issue because PUMA was limited in its "ability to elicit complete testimony from Bickley during her deposition" due to Brooks' redaction and withholding of those documents. Dkt. No. 169 at 16. The Court is required to "allow additional time consistent

---

[2] Because the Court finds that the documents at issue are not privileged, the Court does not address whether Brooks also waived the privilege by failing to list certain documents on its privilege log. Dkt. No. 169 at 13; *see also* Dkt. No. 195 at 10 n.7.

with Rule 26(b)(1) and (2) if needed to fairly examine the deponent or if . . . another person[] or any other circumstance impedes or delays the examination." Fed. R. Civ. P. 30(d)(1). "Repeated depositions are generally disfavored," *PlayUp, Inc. v. Mintas*, 344 F.R.D. 429, 433 (D. Nev. 2023), and "[t]he party seeking a court order to extend the examination, or otherwise alter the limitations, is expected to show good cause to justify such an order," *Johnson v. Couturier*, 261 F.R.D. 188, 190 (E.D. Cal. 2009). PUMA has demonstrated such good cause here, as PUMA did not have access to the redacted and withheld material at the time of the deposition, and Bickley was instructed by Brooks' counsel during her previous deposition to not answer any questions regarding the documents at issue. *See, e.g.*, Dkt. No. 172 at 8, 16. Plaintiffs are therefore permitted a three-hour deposition of Bickley or another knowledgeable witness, strictly limited to questions regarding the redacted or withheld material at issue in this motion. *See Wapato Heritage, LLC v. Evans*, No. CV-07-314-EFS, 2008 WL 4460271, at *3–4 (E.D. Wash. Oct. 1, 2008).

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS PUMA's motion to compel. Dkt. No. 169. Brooks must produce to Plaintiffs unredacted copies of all documents at issue within three business days of this Order. Given the imminent deadline for PUMA's motion for summary judgment, the Court VACATES the current briefing schedule and DIRECTS the parties to meet and confer and propose a new schedule within 10 days of this Order.

Dated this 11th day of October, 2024.

Lauren King
United States District Judge