1

2

3

4

5

6

7

8

THE HONORABLE LAUREN KING

9

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

10

11 PUMA SE, PUMA NORTH AMERICA, INC.
and LLOYD IP LIMITED,

12              Plaintiffs,

Case No. 2:23-CV-00116-LK

13     v.

DECLARATION OF DR. JUSTIN R.
ANDERSON IN SUPPORT OF PUMA'S
MOTION TO EXCLUDE TESTIMONY
AND OPINIONS OF SARAH BUTLER

14 BROOKS SPORTS, INC.,

15              Defendant.

16

17     I, Dr. Justin R. Anderson, hereby declare as follows:

18     1.     I have been retained as an expert in this case by counsel for Plaintiffs PUMA SE

19 and PUMA North America, Inc., and have been asked to provide my opinions regarding the

20 expert report of Sarah Butler, submitted in the PUMA SE, et. al. v. Brooks Sports, Inc. litigation,

21 Case No. 2:23-CV-00116-LK (W.D. Wash.).

22     2.     Attached as **Exhibit A** to this Declaration is a true and correct copy of the Expert

23 Rebuttal Report of Dr. Justin R. Anderson In Response to the Expert Report of Sarah Butler,

24 submitted February 6, 2024 ("Expert Report").

25     3.     If this case proceeds to trial, I intend to testify at the trial and provide expert

26 testimony consistent with the opinions and conclusions set forth in my Expert Report, which are

ANDERSON DECL. IN SUPPORT OF PLS.'
MOT. TO EXCLUDE BUTLER

QUARLES & BRADY LLP
2020 K St NW #400
Washington, DC 20006
202-372-9600

1  incorporated by reference as if fully set forth in this declaration.  As stated below, I declare under

2  penalty of perjury that the contents of my Expert Report are true and correct.

3        I declare under penalty of perjury and under the laws of the State of Washington that to

4  the best of my knowledge and belief, the foregoing is true and correct.

5

6

7

8  Dated: _10/11/24_

9

10  By: _____

11       Justin R. Anderson, Ph.D.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ANDERSON DECL. IN SUPPORT OF PLS.'
MOT. TO EXCLUDE BUTLER

- 2 -

QUARLES & BRADY LLP
2020 K St NW #400
Washington, DC 20006
202-372-9600

# EXHIBIT A

1
2
3          **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF WASHINGTON**
4
5
6   PUMA SE and PUMA NORTH AMERICA,
    INC.,
7
               Plaintiffs,                          Case No. 2:23-cv-00116-LK
8
         v.                                         **EXPERT REBUTTAL REPORT OF**
                                                    **DR. JUSTIN R. ANDERSON**
9   BROOKS SPORTS, INC.,                            **IN RESPONSE TO THE**
                                                    **EXPERT REPORT OF SARAH BUTLER**
10
               Defendant.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF CONTENTS

2

3 Introduction ................................................................................................................. 1

4 Qualifications ............................................................................................................... 2

5 Materials Reviewed and Compensation ...................................................................... 3

6 Overview of the Butler Survey .................................................................................... 6

7 A Note Regarding Different Versions of the Butler Survey ........................................ 14

8 Summary of My Opinions Regarding the Butler Survey ............................................. 15

9 Detailed Opinions Regarding the Butler Survey ......................................................... 17

10    I.    The Butler Survey failed to remove initial respondents whose responses bias the
          reported survey results in favor of Brooks. ................................................... 18

11    II.   The Butler Survey inhibits exposure to Brooks' use of "nitro" and fails to represent
12         realistic marketplace conditions. .................................................................. 21

13    III.  The Butler Survey includes an unreliable control that inflates the control measure
          and suppresses the net measure of confusion. ............................................. 29

14    IV.   The Butler Survey includes a flawed universe that is under-inclusive with respect to
15         the product category, over-inclusive with respect to time, and fails to represent the
          relevant consumer population. ..................................................................... 32

16    V.    The Butler Survey employs a method to test for reverse likelihood of confusion and
17         fails to test for the forward likelihood of confusion that has been alleged in this
          matter. ......................................................................................................... 37

18 Conclusions ................................................................................................................. 38

19

20

21 Exhibit 1: Dr. Justin R. Anderson CV and Testimony Experience

22

23

24

25

26

27

28

## Introduction

1.      I have been retained by Plaintiffs, PUMA SE and PUMA North America, Inc. (collectively, "PUMA"), in the above litigation.  It is my understanding that PUMA sells athletic shoes using the trademark, NITRO.[1]

2.      It is my understanding that Defendant, Brooks Sports, Inc. ("Brooks"), uses "nitro" in advertising for Brooks running shoes.[2]  I also understand that PUMA alleges that Brooks' use of "nitro" is likely to cause confusion with PUMA among the relevant consumer population.[3]

3.      I further understand that Brooks has provided a report by Sarah Butler (the "Butler Report"),[4] which describes a survey (the "Butler Survey") that purportedly measures the likelihood of confusion with PUMA caused by Brooks' use of "nitro" in its advertising.[5]

4.      PUMA has retained me to provide my opinions regarding the Butler Survey.  This report provides those opinions, which are based on materials I reviewed, research I conducted, and my knowledge, education, and experience.  If called to testify in this matter, I understand that it would be in the capacity as a responsive or rebuttal witness to provide my opinions regarding the Butler Survey and Ms. Butler's testimony.  I reserve the right to supplement this report in light of the ongoing discovery in this matter.

5.      In summary, it is my opinion that the Butler Survey is significantly flawed and unreliable for measuring likelihood of confusion.  The survey analysis includes initial respondents who were asked confusing questions before the questions were revised.  The survey fails to represent realistic marketplace conditions.  Additionally, the flawed survey control inflates the control measure and suppresses the net measure of confusion.  Furthermore, the survey universe fails to represent the relevant consumer population.  Finally, the survey inappropriately measures reverse

---

[1] U.S. Trademark Registration No. 7184055 and Amended Complaint pp. 3-4.

[2] Amended Complaint, pp. 5-8.

[3] Amended Complaint, pp. 14-18.

[4] "Expert Report of Sarah Butler," dated January 8, 2024.

[5] Butler Report, p. 4.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

likelihood of confusion instead of the forward likelihood of confusion that I understand PUMA has alleged.

6.    These are significant flaws in the design and execution of the Butler Survey that make the survey unreliable and unable to provide a valid or reliable measure of the alleged likelihood of confusion in this matter.

**Qualifications**

7.    I am a Senior Vice President with MMR Strategy Group ("MMR"), a marketing research and consulting firm.  I have personally designed, conducted, and/or analyzed more than one thousand surveys about a variety of topics, including likelihood of confusion.  I have provided expert reports and/or testimony in other matters indicated in my curriculum vitae and have been qualified as a survey expert by federal courts.

8.    I earned a Doctor of Philosophy (PhD) in Business Administration with a concentration in Marketing from the University of Southern California.  My doctoral studies included training in survey research methods, statistics, marketing, and consumer psychology, among other topics.  I also earned a Master of Business Administration (MBA) with a concentration in Marketing from the University of Illinois at Urbana-Champaign, and a Bachelor of Science in Atmospheric Science from the University of Wisconsin – Madison.

9.    During my career in academia, I was a Marketing professor at the University of North Carolina Wilmington and at California State Polytechnic University, Pomona, and a Marketing instructor at the University of Southern California.  In those positions, I taught MBA and undergraduate courses in marketing research, consumer behavior, marketing strategy, and other topics.  The courses I taught in marketing research emphasized survey research methods.

10.    I have presented my research at conferences of the American Marketing Association and delivered other invited presentations at universities.  In November 2021, I moderated a roundtable discussion regarding litigation surveys for trade dress at the Annual Meeting of the International Trademark Association (INTA).  In May 2019, I moderated a roundtable discussion regarding litigation surveys at the Annual Meeting of INTA.  In September 2016, I

presented a webinar regarding litigation surveys to a meeting of the U.S. Subcommittee of the Non-Traditional Marks Committee of INTA.  In October 2015, I was a panelist at a Continuing Legal Education seminar regarding litigation surveys sponsored by the Bar Association of San Francisco.

11.     I am a member of the American Marketing Association, the Association of National Advertisers, the Brand Activation Association, the Insights Association, and the International Trademark Association (INTA).  I serve as a member of The Trademark Reporter Committee of INTA and have served as a member of INTA's Non-Traditional Marks Committee.

12.     I have served on the editorial board of the *Journal of Brand Strategy*.  I have also served as a reviewer for the *Journal of Brand Strategy*, *Journal of Brand Management*, *Marketing Science*, and *Arts and the Market*, as well as for several academic conferences.

13.     I previously worked as a Research Director at Lieberman Research Worldwide marketing research agency, and as a Senior Research Analyst at BBDO Chicago advertising agency.  In both of those positions, I designed and conducted surveys for a variety of clients in diverse industries.  I have also served as a meteorological officer in the United States Air Force.

14.     Exhibit 1 provides my curriculum vitae, including all of my publications in the past ten years, as well as testimony and expert reports I have provided during the past four years.


**Materials Reviewed and Compensation**

15.     For this report, I have reviewed the following materials:

     i.    U.S. Trademark Registration No. 7184055, dated October 3, 2023.

     ii.    Complaint for Trademark Infringement, Patent Infringement, and Unfair Competition, dated July 8, 2022 ("Complaint").

     iii.    Amended Complaint for Trademark Infringement, Patent Infringement, and Unfair Competition, dated January 24, 2024 ("Amended Complaint").

     iv.    Brooks Sports, Inc.'s Answer, Defenses, and Counterclaims, dated September 28, 2022 ("Answer and Counterclaims").

v.    Counterclaim-Defendants' Answer and Defenses to Counterclaim-Plaintiff
      Brooks Sports, Inc.'s Counterclaims, dated October 19, 2022 ("Answer to
      Counterclaims").

vi.   Brooks Sports, Inc.'s Answer, Defenses, and Amended Counterclaims, dated
      November 9, 2022 ("Amended Counterclaims").

vii.  Expert Report of Sarah Butler, dated January 8, 2024 ("Butler Report").  I also
      reviewed two Excel files that I understand provide data for the respondents
      included in the final analysis of the Butler Survey,[6] and data for all respondents
      who started the Butler Survey.[7]

viii. "reCAPTCHA  |  Google for Developers." *Google*, Google,
      developers.google.com/recaptcha, accessed February 3, 2024.

ix.   "Nike Streakfly Road Racing Shoes. Nike.com." *Nike.com*,
      www.nike.com/t/streakfly-road-racing-shoes-8rTxtR, accessed February 3, 2024.

x.    "Velocity Nitro™ 2 Men's Running Shoes." *PUMA*,
      us.puma.com/us/en/pd/velocity-nitro-2-mens-running-shoes/195337?referrer-
      category=collections-running-nitro-shop-all&swatch=16, accessed February 3,
      2024.

xi.   "Everyday Running." *PUMA*, us.puma.com/us/en/sport/running/everyday-
      running, accessed February 3, 2024.

xii.  "Thanks for Signing Up!" *Meet Brooks - Our Company | Brooks Running*,
      www.brooksrunning.com/en_us/meet-brooks/our-company, accessed February 3,
      2024.

xiii. "Nitro-Infuse Your Run." *Run on Nitro | Shoe Research and Innovation | Brooks
      Running*, www.brooksrunning.com/en_us/run-on-nitro, accessed February 3,
      2024.

---

[6] Provided in an Excel file named "Exhibit H to Butler Report - Running Final 12.14.23."

[7] Provided in an Excel file named "Exhibit H to Butler Report - Running AS 12.14.23."

xiv.     "Cushioned Running Shoes & Performance Wear: Hoka®." *Cushioned Running Shoes & Performance Wear | HOKA®*, www.hoka.com/en/us/mens-race-shoes/mach-5/1127893.html?dwvar_1127893_color=WFM, accessed February 3, 2024.

xv.      "About." *Insights Association*, www.insightsassociation.org/About-Us, accessed February 3, 2024.

xvi.     "Data You Want. Service You Need." *Veridata Insights*, 3 Nov. 2022, veridatainsights.com, accessed February 3, 2024.

xvii.    Websites for Brooks and PUMA, as well as retail websites that sell Brooks and/or PUMA shoes.

xviii.   Information regarding the expected mileage for certain PUMA running shoes (PUMANITRO_013581 to _013587).

xix.     Dictionary definitions provided by Brooks, including PUMANITRO-048317, PUMANITRO-048318, and PUMANITRO-048319.

xx.      Dictionary definitions provided by PUMA, including PUMANITRO_048092 to _048094, PUMANITRO_048095 to _048097, PUMANITRO_048098 to _048101, PUMANITRO_048102 to _048104, PUMANITRO_048105 to _048107, PUMANITRO_048108 to _048110, PUMANITRO_048111 to _048113, PUMANITRO_048114 to _048128, PUMANITRO_048129 to _048130, PUMANITRO_048131, PUMANITRO_048132, PUMANITRO_048133, and PUMANITRO_048134.

16.    I also had a phone call on February 5, 2024 with Ms. Erin Longin, General Manager of PUMA's Running and Training Business Unit, regarding running shoes and consumers who purchase the type of running shoes relevant to this matter.

17.    In addition, I consulted published literature and other authorities relevant to the issues and theories in this matter, which are cited in this report.  I also relied on my professional experience and knowledge in fields such as surveys, consumer behavior, and marketing in forming the opinions provided in this report.

18.     MMR bills for my time in this matter at $850 per hour, except for testimony at deposition or trial, which is billed at $7,000 per day.  MMR's fees do not depend on the outcome of this matter, and I have no personal interest in the outcome of this matter.

**Overview of the Butler Survey**

19.     The Butler Report indicates that Ms. Butler "designed and conducted a likelihood-of-confusion survey" to "evaluate whether Brooks' use of the word 'nitro' in connection with its running shoes causes consumers to associate its products with Puma."[8]

20.     The Butler Survey included 400 respondents,[9] who were recruited from a consumer panel operated by Veridata Insights.[10]  The Butler Report indicates that respondents qualified for the survey if they "have purchased performance running shoes for themselves or another adult in the past twelve months or are likely to do so in the next six months" and "typically spend $100 or more on performance running shoes."[11]  Ms. Butler also "required that at least half of the sample indicated they run at least once a week or more."[12]

21.     To qualify for the survey, the Butler Survey screened respondents using the following substantive qualification questions:

    i.     Question S10 asked,[13] "In the past twelve months, which of the following types of shoes, if any, have you purchased?"  Responses included, "Athletic shoes," among other options.

    ii.     Respondents who indicated in response to Question S10 that they purchased "Athletic shoes" in the past twelve months were asked Question S11,[14] "You indicated you purchased athletic shoes in the past twelve months.  Which of the

---

[8] Butler Report, p. 8.

[9] Butler Report, p. 4.

[10] Butler Report, p.10.

[11] Butler Report, p. 9.

[12] Butler Report, p. 10.

[13] Butler Report, Exhibit D, p. 3.

[14] Butler Report, Exhibit D, p. 3.

following types of athletic shoes, if any, did you purchase?"  Response options included "Performance running shoes," among other options.

    iii.    Respondents who indicated in response to Question S11 that they purchased "Performance running shoes" in the past twelve months were asked Question S12,[15] "You indicated you have purchased performance running shoes in the <u>past twelve months</u>.  Who did you purchase performance running shoes for?"  Response options included "Myself," "Another adult," "A teenager," "A child," "None of these," and "Don't know / unsure."

    iv.    Respondents who did not select "Myself" or "Another adult" in response to Question S12 were then asked Questions S13, S14, and S15.  Those corresponded to Questions S10, S11, and S12, except that Questions S13, Q14, and S15 asked about the "<u>next six months</u>."[16]

    v.    Respondents who indicated in response to Question S12 or Question S15 that they have purchased (Question S12) or are likely to purchase (Question S15) performance running shoes for themselves or for another adult were allowed to continue the survey.

    vi.    Question S16 asked,[17] "Approximately how much do you typically spend when purchasing adult performance running shoes?  Response options included, "Less than $50," "Between $50 – $74.99," "Between $75 – $99.99," "Between $100 – $124.99," "Between $125 – $149.99," "$150 or more," and "Don't know / unsure."  Respondents who selected "Between $100 – $124.99," "Between $125 – $149.99," or "$150 or more" were allowed to continue the survey.

---

[15] Butler Report, Exhibit D, p. 4.

[16] Butler Report, Exhibit D, pp. 4-5.

[17] Butler Report, Exhibit D, p. 5.

22.    After qualifying for the survey, half of the respondents were shown an image based on a portion of a webpage from the Brooks website. Figure 1 below shows the image shown to respondents who completed the survey using a desktop, laptop, or tablet computer. The other half of the respondents were shown a control image. Figure 2 below shows the control image shown to respondents who completed the survey using a desktop, laptop, or tablet computer. Figure 3 below shows the mobile image shown to respondents who completed the survey using a smartphone. Figure 4 shows the control image shown to respondents who completed the survey using a smartphone.

**Figure 1: Image of the Modified Brooks Webpage Displayed in the Butler Survey[18]**



**Figure 2: Control Webpage Image Displayed in the Butler Survey[19]**



---

[18] Butler Report, Exhibit F, p. 2.

[19] Butler Report, Exhibit F, p. 4.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

**Figure 3:**
**Image of the Modified**
**Brooks Mobile Webpage**
**Displayed in the Butler Survey[20]**



**Figure 4:**
**Control Mobile Image**
**Displayed in the Butler Survey[21]**



---

[20] Butler Report, Exhibit E, p. 82.

[21] Butler Report, Exhibit E, p.84.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

23.     After confirming that respondents saw the image clearly, the survey showed respondents one of three images showing product webpages, including an image of a PUMA webpage for PUMA Velocity NITRO 2 Men's Running Shoes,[22] an image of a Nike webpage for Nike Streakfly Road Racing Shoes,[23] or an image of a HOKA webpage for HOKA Mach 5 Men's Race shoes.[24]

24.     After confirming that respondents saw the image of the product webpage clearly, the survey asked the following questions to measure likelihood of confusion between the image of the Brooks webpage shown earlier and the image of the product webpage.  For each of the following questions, a smaller image of the product webpage was shown at the top of the screen, and respondents were given the option to see the Brooks webpage again, if they chose.[25]

     i.     Question Q3 asked, "Do you believe the **ADVERTISEMENT** you were shown first and the running shoes from the product page (shown here) are made or put out by…?"  Response options included, "The <u>same</u> brand or company," "<u>Different</u> brands or companies," and "Don't know / no opinion."[26]

     ii.     Respondents who selected "The <u>same</u> brand or company" in response to Question Q3 were asked Question Q4, "What makes you say that the **ADVERTISEMENT** you were shown first and the running shoes from the product page (shown here) are made or put out by the same brand or company?"

---

[22] Butler Report, Exhibit F, pp. 6-9.

[23] Butler Report, Exhibit F, pp. 11-14.

[24] Butler Report, Exhibit F, pp. 16-18.

[25] Questions Q3, Q4, Q5, and Q6 were used to measure likelihood of confusion between the Brooks webpage and the PUMA product webpage.  Questions Q8, Q9, Q10, and Q11 asked the same questions to measure likelihood of confusion between the Brooks webpage and the Nike product webpage (*see* Butler Report, Exhibit D, pp. 11-12).  Questions Q13, Q14, Q15, and Q16 asked the same questions to measure likelihood of confusion between the Brooks webpage and the HOKA product webpage (*see* Butler Report, Exhibit D, pp. 13-14).  The order in which respondents were asked questions about each product webpage was randomized (*see* Butler Report, Exhibit D, p. 8).

[26] Butler Report, Exhibit D, p. 9.

1    Respondents answered in their own words or selected a box labeled, "Don't
2    know / no opinion."[27]

3       iii.   Respondents who did not select "The <u>same</u> brand or company" in response to
4    Question Q3 were asked Question Q5, "Do you believe that the brand or
5    company shown in the **ADVERTISEMENT** you saw first…?"  Response
6    options included, "<u>Is</u> connected to, affiliated with, or sponsored by the
7    company/brand that puts out the running shoes from the product page (shown
8    here)," "<u>Is not</u> connected to, affiliated with, or sponsored by the company/brand
9    that puts out the running shoes from the product page (shown here)," and "Don't
10    know / no opinion."[28]

11       iv.   Respondents who selected "<u>Is</u>" in response to Question Q5 were asked Question
12    Q6, "What specifically about the **ADVERTISEMENT** makes you believe it is
13    connected to, affiliated with, or sponsored by the company/brand that puts out the
14    running shoes from the product page (shown here)?"  Respondents answered in
15    their own words or selected a box labeled, "Don't know / no opinion."[29]

16    25.    Respondents were then asked Questions Q8 through Q11 and Q13 through Q16
17    regarding images showing the other two product webpages.  The survey randomized the order of
18    Questions Q3 through Q6, Q8 through Q11, and Q13 through Q16 regarding the three product
19    webpages.[30]

20    26.    The survey then measured the frequency with which respondents engage in running.

21       i.   Question S18 asked, "Which of the following types of activities, if any, do you
22    regularly engage in?"[31]  Response options included, "Running," "Cycling,"

---

[27] Butler Report, Exhibit D, p. 9.

[28] Butler Report, Exhibit D, p. 10.

[29] Butler Report, Exhibit D, p. 10.

[30] Butler Report, Exhibit D, p. 8.

[31] Butler Report, Exhibit D, p. 14.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

"Swimming," "Yoga/Pilates," "CrossFit," "Weightlifting," "Hiking," "None of these," and "Don't know / unsure."

    ii.    For each activity selected in response to Question S18, Question S19 asked, "How often do you engage in the following activities?"  For each activity, respondents selected, "Twice a week or more," "Once a week," "2-3 times a month," "Once a month," and "Less than once a month."

    iii.    Finally, for respondents who selected "Running" in response to Question S18, the survey asked Question S20, "Which of the following brands of performance running shoes, if any, do you own?"  Response options included "HOKA," "Brooks," "ASICS," "Nike," "Puma," "Adidas," "New Balance," "Saucony," "Mizuno," "Other," "None of these," and "Don't know / unsure."

27.    The Butler Report provides the results from the survey indicated in Table A below.

**Table A:  Survey Results Provided in the Butler Report[32]**

| Overall Confusion Estimate | Test | Control | Net |
|---|---|---|---|
| Total respondents | 200 | 200 | |
| PUMA | 41.5% | 36.0% | 5.5% |
| Nike | 26.0% | 32.5% | -6.5% |
| HOKA | 39.5% | 31.0% | 8.5% |

28.    Based on the Butler Survey, Ms. Butler concluded that "The results of my survey demonstrate that there is no meaningful likelihood of confusion attributable to Brooks' use of 'nitro.'"[33]  Ms. Butler further concluded that, "Brooks' use of 'nitro' will not cause consumers to be confused and will not lead to associations between Brooks and Puma."[34]

---

[32] Butler Report, Table 5, p. 29.

[33] Butler Report, p. 31.

[34] Butler Report, p. 32.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

**A Note Regarding Different Versions of the Butler Survey**

29.     The Butler Report indicates that Ms. Butler "examined the initial data collected to ensure that the survey was working properly and that respondents did not have any difficulties completing or understanding the survey."[35]

30.     However, the report also indicates that, after data from the initial 106 respondents was collected, Ms. Butler noticed that "some respondents were comparing the Puma/Nike/HOKA thumbnail image (presented with the question text) with the full-size version of the same Puma/Nike/HOKA product page they had just reviewed, rather than the advertisement."[36]

31.     In response, Ms. Butler removed 22 respondents who provided responses to open-ended questions that indicated they "misinterpreted the question."[37]  This constitutes 20.8% of the initial 106 respondents.  The remaining 84 respondents, who did not expressly indicate that they misinterpreted the question, were retained in the survey and included in the final analysis.

32.     Ms. Butler also "revised the question to further clarify that the comparative reference was to the Brooks advertisement."[38]  The Butler Report does not specify what question or questions were changed and does not provide the initial version of the questionnaire before any changes were made.

33.     Unless otherwise specified, this rebuttal report provides results as indicated in the Butler Report, which I understand include respondents who saw the initial version of the questionnaire and respondents who saw the revised version of the questionnaire.  Where a distinction needs to be drawn, this rebuttal report identifies the original version of the questionnaire as the "initial" version and the changed version of the questionnaire as the "revised" version.  Similarly, it refers to respondents who saw the initial version of the questionnaire as the "initial" respondents, and to respondents who saw the revised version of the questionnaire as the "revised" respondents.

---

[35] Butler Report, p. 24.

[36] Butler Report, p. 24, FN 28.

[37] Butler Report, p. 24, FN 28.

[38] Butler Report, p. 24, FN 28.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

1    **Summary of My Opinions Regarding the Butler Survey**

2    34.    Based on my review of the Butler Report, my review of other materials identified in this

3    report, and my experience, I believe that the Butler Survey is significantly flawed, and does not

4    provide a valid or reliable measure of likelihood of confusion in this matter.  As a result, the

5    Butler Survey fails to support Ms. Butler's conclusions.

6    35.    The Butler Survey's measure of likelihood of confusion is unreliable because it suffers

7    from significant flaws, including the following:

8         i.    The Butler Survey failed to remove initial respondents whose responses bias the

9              reported survey results in favor of Brooks.  The Butler Report indicates that the

10             initial version of the Butler Survey was confusing and caused Ms. Butler to

11             revise the survey questionnaire.[39]  Despite acknowledging the flaw in the

12             undisclosed initial questionnaire, Ms. Butler retained 84 of the initial respondents

13             in her final analysis of the survey data.  The survey measure of likelihood of

14             confusion is substantially lower among initial respondents than among

15             respondents who completed the revised version of the survey.  Leaving initial

16             respondents in the analysis biases the results in favor of Brooks.

17        ii.    The Butler Survey inhibits exposure to Brooks' use of "nitro" and fails to

18             represent realistic marketplace conditions.  The Butler Survey did not display an

19             image of the actual Brooks webpage that is under dispute.  Instead, the survey

20             displayed an image of a modified version of the Brooks webpage that showed

21             only the top portion of the webpage and changed the text to remove some of

22             Brooks' use of "nitro".  The actual Brooks webpage under dispute includes more

23             uses of "nitro" and displays "nitro" more prominently.  Instead of testing the

24             actual Brooks webpage, the Butler Survey displayed a modified version that

25             reduces respondents' exposure to Brooks' use of "nitro", and which Brooks never

26

27

28    [39] Butler Report, p. 24, FN 28.

Expert Rebuttal Report of Dr. Justin R. Anderson
                Case No. 2:23-cv-00116-LK

1   used in the marketplace.  This makes the image tested in the survey artificial,

2   unrealistic, and biased in Brooks' favor.

3   iii.    <u>The Butler Survey includes an unreliable control that inflates the control measure</u>

4          <u>and suppresses the net measure of confusion.</u>  The Butler Survey shows that a

5          substantial percentage of respondents (41.5%) confused Brooks' use of "nitro"

6          with PUMA.  The reason Ms. Butler concludes that confusion is not significant is

7          because the survey's control is flawed and generates an inflated control measure.

8          This, in turn, artificially deflates the net confusion measure.  The root cause for

9          this inflated control measure is the Butler Survey's use of an unreliable control

10         that violates authoritative standards by including the disputed word "nitro".

11         Because of its use of a flawed control, the Butler Survey is unable to provide any

12         reliable measure of survey noise, making its net measure unreliable and

13         artificially low.

14  iv.    <u>The Butler Survey includes a flawed universe that is under-inclusive with respect</u>

15         <u>to the product category, over-inclusive with respect to time, and fails to represent</u>

16         <u>the relevant consumer population.</u>  The Butler Survey universe is limited to

17         consumers who purchase "performance" running shoes instead of just "running

18         shoes."  Consumers who should qualify for the survey but who don't consider

19         their relevant shoes to be "performance" shoes were excluded from the survey.

20         This leaves the survey universe under-inclusive with respect to the product

21         category that qualifies respondents for the survey.  The survey universe is also

22         under-inclusive because at least half of all respondents had to qualify as engaging

23         in running at least weekly.  At the same time, the survey universe is over-

24         inclusive with respect to time of purchase.  Courts have adopted a "well-

25         established" standard that "only potential future purchasers, not past purchasers,

26         are relevant to a confusion study."[40]  Yet, only 63 respondents (15.8% of the

27  _____

28  [40] *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007).

total) met this future-focused qualification standard.[41]  The opinions of the other

84.3% of respondents are not relevant to this matter.  The failure of the Butler

Survey to include the right survey universe makes the survey unreliable for

measuring likelihood of confusion in this matter.

    v.    <u>The Butler Survey employs a method to test for reverse likelihood of confusion and fails to test for the forward likelihood of confusion that has been alleged in this matter.</u>  The Butler Survey is a two-room Squirt survey.  When using that format to measure forward likelihood of confusion (which I understand to be PUMA's allegation), respondents should first be exposed to the senior user and then be exposed to a lineup including the junior user or control, along with distractors.[42]  In violation of this authoritative standard, the Butler Survey reversed the order of presentation, first exposing respondents to the modified Brooks webpage, and then showing PUMA's product in the lineup.  At best, this order would reflect the order in which to measure reverse likelihood of confusion, which is not at issue here.[43]  Thus, the survey fails to measure the kind of likelihood of confusion that is relevant to this dispute.

36.    These are significant flaws in the design and execution of the Butler Survey that make the Butler Survey unreliable and unable to provide a valid or reliable measure of likelihood of confusion in this matter.

**Detailed Opinions Regarding the Butler Survey**

37.    The Butler Survey suffers from significant flaws that make the survey unreliable and unable to provide a valid or reliable measure of likelihood of confusion, which I describe below.

---

[41] Butler Report, p. 25.

[42] Swann, Jerre B.  "Likelihood of Confusion Surveys and the Straitened Scope of Squirt."  *The Trademark Reporter*, vol. 98, no. 3, 2008, pp. 749-750.  *See also* Swann, Jerre, B. "Eveready and Squirt – Cognitively Updated."  *The Trademark Reporter*, vol. 106 no. 4, pp. 739-740.

[43] The survey is also flawed for presenting the control image in the first room, instead of in the lineup.

    Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

**I.      The Butler Survey failed to remove initial respondents whose responses bias the reported survey results in favor of Brooks.**

38.      As previously discussed, the Butler Survey began with an initial group of 106 respondents who saw the initial questionnaire.  After collecting that initial data, Ms. Butler noticed that "some respondents were comparing the Puma/Nike/HOKA thumbnail image (presented with the question text) with the full-size version of the same Puma/Nike/HOKA product page they had just reviewed, rather than the advertisement."[44]

39.      In response, Ms. Butler removed 22 respondents who provided responses to open-ended questions that indicated they "misinterpreted the question."[45]  This constitutes 20.8% of the initial 106 respondents.  The remaining 84 respondents, who did not expressly indicate that they misinterpreted the question, were retained in the survey and included in the final analysis.

40.      Ms. Butler also "revised the question to further clarify that the comparative reference was to the Brooks advertisement."[46]  The Butler Report does not specify what question or questions were changed, and does not provide the initial version of the questionnaire before any changes were made.

41.      When an initial questionnaire is changed to clarify questions known to cause confusion among a significant portion of respondents, it is good practice to start over with a revised version and to remove all of the initial respondents from the survey and subsequent analysis.  Retaining some of the initial respondents in the final analysis would only be acceptable if the responses among those initial respondents yield survey results similar to results among revised respondents.  Results of the Butler Survey are not similar among initial and revised respondents.

---

[44] Butler Report, p. 24, FN 28.

[45] Butler Report, p. 24, FN 28.

[46] Butler Report, p. 24, FN 28.

42.     Ms. Butler's decision to retain the 84 remaining initial respondents in the final analysis creates a flaw in the survey analysis.  Those 84 initial respondents may not have provided a response to an open-ended question that expressly indicated that they misunderstood the survey questions.  However, that does not mean that they were not confused by the questions that Ms. Butler acknowledges were confusing to 20.8% of the initial respondents.

43.     Even if those 84 initial respondents were not confused by the questions in the initial questionnaire that confused 20.8% of initial respondents, those remaining initial respondents saw a different questionnaire (which has not been disclosed), that generated different survey results among those initial respondents than among the respondents who saw the revised questionnaire.

44.     Table B below provides the results of the Butler Survey among the remaining initial respondents and among revised respondents.

**Table B:  Comparison of Survey Results by Version[47]**

| Overall Confusion Estimate for PUMA | Initial Respondents | Revised Respondents |
| --- | --- | --- |
| Respondents in the Test group, who viewed the portion of the Brooks webpage | 46 | 154 |
| Respondents in the Control group, who viewed the portion of the Brooks webpage | 37 | 163 |
| Likelihood of confusion among respondents in the Test group | 37.0% | 42.9% |
| Likelihood of confusion among respondents in the Control group | 40.5% | 35.0% |
| Net likelihood of confusion measure for PUMA | -3.5% | 7.9% |

45.     Table B shows that the net likelihood of confusion for PUMA was only -3.5% among initial respondents, but was 7.9% among revised respondents.  The difference between these groups of respondents, or the difference in the survey's measure of net likelihood of confusion

---

[47] Based on analysis of Butler Report, Exhibit H.

1   for PUMA is 11.4%.[48]  That constitutes a substantial difference in the survey results between

2   initial and revised respondents.

3   46.     The Butler Report does not disclose the initial questionnaire.  However, it is clear that the

4   questions were confusing, which the Butler Report acknowledges.  Furthermore, the analysis in

5   Table B indicates that the survey results among initial respondents significantly biases the survey

6   results in favor of Brooks.

7   47.     The initial respondents in the Butler Survey should have been removed from the survey

8   analysis.  Ms. Butler's decision to retain initial respondents causes her to rely on responses to

9   questions that she acknowledges were confusing, and which bias her analysis in favor of Brooks.

10  48.     I am not providing the opinion that the 7.9% measure among revised respondents is a

11  reliable measure of likelihood of confusion for PUMA.  For reasons that will be explained later

12  in this rebuttal report, the survey's flaws create significant bias that reduces the survey measure,

13  and that likelihood of confusion is higher than the survey measures.

14  49.     Despite making changes to the undisclosed initial questionnaire, the revised version of

15  the questionnaire is still confusing and unreliable.

16  50.     Ms. Butler removed 22 (20.8%) of 106 initial respondents for providing responses to

17  open-ended questions that expressly indicated that respondents misunderstood the task.  She also

18  removed 54 (14.6%) of 370 revised respondents for the same reason.[49]  Thus, the revised version

19  still resulted in 14.6% of respondents providing responses that expressly indicated that they

20  misunderstood the questions.  It is likely that other revised respondents did not understand the

21  questions but provided responses that did not expressly indicate that misunderstanding.

22

23

24

25  [48] Calculated as 7.9% - (-3.5%).

26  [49] The Butler Report indicates that 76 total respondents were removed for misunderstanding the
    instructions and that 22 of those were initial respondents, meaning that 54 (i.e., 76 - 22) were revised
27  respondents.  Exhibit H of the Butler Report indicates that there were 406 revised respondents and that 36
    of those were removed for providing inattentive responses to open-ended questions, meaning that 370
28  (i.e., 406 – 36) revised respondents completed the revised questionnaire and provided attentive responses.

Expert Rebuttal Report of Dr. Justin R. Anderson
                                                    Case No. 2:23-cv-00116-LK

51.    The Butler Survey includes respondents who saw a questionnaire that Ms. Butler acknowledges created confusion among respondents, and whose responses bias the survey measures in favor of Brooks.  Even the revised questionnaire appears to create a significant degree of confusion among respondents.  The Butler Survey is confusing.  Such confusion makes Ms. Butler's opinions, which are based on the results of that survey, unreliable.

## II.    The Butler Survey inhibits exposure to Brooks' use of "nitro" and fails to represent realistic marketplace conditions.

52.    A survey that purportedly measures likelihood of confusion must represent a realistic marketplace context.  According to *McCarthy on Trademarks and Unfair Competition*, "The closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[50]

53.    The Butler Survey fails to provide a reliable test of Brooks' use of "nitro" because it did not test any webpage that Brooks actually used.  Instead, the Butler Survey tested only a portion of a Brooks webpage – and only a modified version of that webpage, which removed several of Brooks' uses of "nitro" from the image displayed to respondents.

54.    Figure 5A below reproduces Figure 1, which was shown previously in this rebuttal report.  This figure shows the image of a portion of a modified Brooks webpage shown to respondents who completed the survey using a desktop, laptop, or tablet computer.  Figure 5B below shows the image of the same portion of the Brooks webpage before Ms. Butler modified it.

---

[50] McCarthy, J. Thomas.  § 32:163 "Survey methodology - Approximating market conditions."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-457, quoting *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218; 231· (S.D.N.Y. 2010).

**Figure 5A: Image of the Modified Brooks Webpage Displayed in the Butler Survey[51]**



**Figure 5B: Image of the Unaltered Portion of the Brooks Webpage[52]**



---

[51] Butler Report, Exhibit F, p. 2.

[52] Butler Report, Exhibit G, p. 2.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

55.    As shown in Figures 5A and 5B, the image of a portion of the Brooks webpage tested in the Butler Survey (Figure 5A) was modified from the original (Figure 5B).  The Butler Report indicates that this was to remove "references to 'nitrogen,'"[53] but the modification actually removed a second use of "nitro" on this portion of the Brooks webpage.  Table C below provides a side-by-side comparison showing the modifications to the text between these images.

**Table C:  Modifications to the Brooks Webpage Displayed in the Butler Survey**

| Original Brooks Webpage (Figure 5B) | Modified Brooks Webpage Displayed in the Butler Survey (Figure 5A) |
|---|---|
| Nitro-infuse your run | Displayed the same text in smaller font. |
| What will nitro bring to your run? Everything.  And more. | Deleted this entire passage. |
| Our innovative nitrogen-infusion process amplifies your run for bigger benefits with zero compromises. | Deleted "nitrogen-infusion." |

56.    Table C shows that the image of the portion of the Brooks webpage that was tested in the Butler Survey removes one of the uses of "nitro" and displays the other in smaller font than was originally used on the real Brooks webpage.  Thus, contrary to Ms. Butler's claim that the modification only removed references to "nitrogen," the modification actually reduced exposure to Brooks' use of "nitro".

57.    This artificially reduced exposure to Brooks' use of "nitro" is not a mere technical flaw.  It also reduces the measure of likelihood of confusion provided by the Butler Survey in a manner that biases the survey results in favor of Brooks.

58.    According to Exhibit H of the Butler Report, 207 respondents (51.8% of the total 400) completed the survey using a desktop, laptop, or tablet computer.  In contrast, 193 respondents (48.3% of the total 400) completed the survey using a smartphone.

---

[53] Butler Report, p. 16, FN 23.

59.    Figure 6A below reproduces a cropped portion of Figure 1, which was shown previously in this rebuttal report, and shows the image of a portion of a modified Brooks webpage shown to respondents who completed the survey using a desktop, laptop, or tablet computer.  Figure 6B below reproduces Figure 3, which was shown previously in this rebuttal report, and shows the image of a portion of the Brooks mobile webpage shown to respondents who completed the survey using a smartphone.

<table>
<tr><td><strong>Figure 6A:<br>Image of the Modified<br>Brooks Webpage Displayed<br>in the Butler Survey[54]</strong></td><td><strong>Figure 6B:<br>Image of the Modified<br>Brooks Mobile Webpage Displayed<br>in the Butler Survey[55]</strong></td></tr>
<tr><td></td><td></td></tr>
</table>

[54] Butler Report, Exhibit F, p. 2.

[55] Butler Report, Exhibit E, p. 82.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

60.    As shown in Figure 6A, the image of a portion of the Brooks webpage tested in the Butler Survey displays only one of Brooks' uses of "nitro".  As shown in Figure 6B, the image of a portion of the Brooks mobile webpage tested in the Butler Survey displays two of Brooks' uses of "nitro".  Table D below provides a side-by-side comparison showing the text in each of these images.

**Table D:  Text Displayed in the Brooks Webpage and the Brooks Mobile Webpage Displayed in the Butler Survey**

| Text Displayed in the Modified Brooks Webpage Displayed in the Butler Survey (Figure 6A) | Text Displayed in the Brooks Mobile Webpage Displayed in the Butler Survey (Figure 6B) |
| --- | --- |
| Nitro-infuse your run | Nitro-infuse your run |
| Our innovative process amplifies your run for bigger benefits with zero compromises. | Our innovative nitro-infusion process amplifies your run for bigger benefits with zero compromises. |

61.    Table D shows that the image of a portion of the Brooks webpage tested in the Butler Survey displays only one of Brooks' uses of "nitro", while the image of a portion of the Brooks mobile webpage tested in the Butler Survey displays two of Brooks' uses of "nitro".

62.    Table E below shows the survey measure of likelihood of confusion for PUMA among respondents who viewed one of Brooks' uses of "nitro" and the survey measure of likelihood of confusion for PUMA among respondents who viewed two of Brooks' uses of "nitro".  Table E only includes respondents who viewed the revised questionnaire, since we know that the initial questionnaire was confusing to respondents.

**Table E:  Survey Measures of Likelihood of Confusion for PUMA
Among Respondents Who Viewed One or Two of Brooks' Uses of "nitro"[56]**

| Overall Confusion Estimate for PUMA | Respondents Who Viewed One of Brooks' Uses of "nitro" (Modified Webpage) | Respondents Who Viewed Two of Brooks' Uses of "nitro" (Mobile Webpage) |
|---|---|---|
| Respondents who viewed the Test image | 76 | 78 |
| Respondents who viewed the Control image | 97 | 66 |
| Likelihood of confusion among respondents who viewed the Test image | 34.2% | 51.3% |
| Likelihood of confusion among respondents who viewed the Control image | 32.0% | 39.4% |
| Net likelihood of confusion measure for PUMA | 2.2% | 11.9% |

63.    Table E shows that the net likelihood of confusion for PUMA was only 2.2% among respondents who viewed only one of Brooks' uses of "nitro", but was 11.9% among respondents who viewed two of Brooks' uses of "nitro".  The difference between these groups of respondents, or the difference in the survey's measure of net likelihood of confusion for PUMA is 9.7%.[57]  That constitutes a substantial difference in the survey results between respondents who viewed one versus two of Brooks' uses of "nitro".

64.    Displaying two uses of "nitro" instead of only one increases the survey's measure of likelihood of confusion from 2.2% to 11.9%.  Yet, neither of the images displayed in the survey represents the actual Brooks webpage or Brooks' use of "nitro" in *three* places on its webpage.

65.    The image tested in the Butler Survey fails to represent realistic marketplace conditions because it is incomplete.  The Butler Report indicated that the survey tested the advertisement that "Plaintiffs presented … in the *Complaint*, p.6."[58]

---

[56] Includes only respondents who viewed the revised questionnaire.

[57] Calculated as 11.9% - 2.2%.

[58] Butler Report, p. 16, FN 23.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

66.    There is no standard that a survey test images presented in abbreviated form in a pleading document.  On the contrary, the standard is that a survey must test stimuli that "mirror the situation in which the ordinary person would encounter the trademark."[59]  That means that the survey should have tested the entire Brooks webpage as consumers would have encountered it in a real marketplace situation.

67.    Figure 7 below provides an excerpt from the full Brooks webpage provided in an exhibit to the Butler Report.

**Figure 7:  Image of an Excerpt from the Brooks Webpage[60]**



---

[59] McCarthy, J. Thomas.  § 32:163 "Survey methodology - Approximating market conditions."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-457, quoting *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218; 231·(S.D.N.Y. 2010).

[60] Butler Report, Exhibit G, p. 4.

68.    Figure 7 shows that, just below the portion of the Brooks webpage that was modified for display in the Butler Survey, there is another – and more prominent – use of "nitro" displayed in a video on the Brooks webpage.  This portion of the webpage, and this use of "nitro" by Brooks, was available to consumers who visited the Brooks webpage.  However, it was omitted entirely from the Butler Survey.

69.    Moving from one of Brooks' use of "nitro" to two uses of "nitro" increased the likelihood of confusion for PUMA from 2.2% to 11.9%.  Therefore, it is almost a certainty that showing the complete and unmodified Brooks webpage with three uses of "nitro", including the prominent use in the eye-catching video, would have generated a higher likelihood of confusion measure for PUMA than the measure provided by the Butler Survey.  That is, if the Butler Survey had displayed the actual Brooks webpage, even despite its other serious flaws, the survey likely would have generated a measure that indicates that a significant likelihood of confusion exists.[61]

70.    Rather than testing the Brooks webpage in its entirety and in its original version, the Butler Survey displayed only a portion of the Brooks webpage, and only a modified version. This resulted in the survey showing only one of Brooks' uses of "nitro" on this webpage, and in a smaller font than it was actually displayed.  Because of these changes, the Butler Survey reduced the number and prominence of Brooks' use of "nitro" on this webpage.  The survey thus failed to represent Brooks' use of "nitro" in a manner that represents how consumers would have actually encountered Brooks' use of "nitro" on the unmodified original Brooks webpage in a real marketplace situation.

71.    This failure of the Butler Survey to represent realistic marketplace conditions is not a mere technical flaw.  By reducing the exposure of survey respondents to Brooks' use of "nitro", respondents would be less likely to attend to or recall the word "nitro" on the Brooks webpage. That would reduce the similarity evaluation that respondents made between the modified portion

---

[61] McCarthy, J. Thomas. § 32:188 "Likelihood of confusion--Percentage figures in the cases--Evidence of a likelihood of confusion." *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, pp. 32-560 through 32-562.  *See also* Ezell, Matthew G. and AnnaBelle Sartore.  "Survey Percentages in Lanham Act Matters." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 2nd ed., edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2022, pp. 320-321, FN 18.

of the Brooks webpage and the product page for PUMA Velocity NITRO 2 Men's Running Shoes displayed in the survey.  The result of this reduced exposure would cause the survey's measure of likelihood of confusion to be deflated in the test condition, meaning that the survey measure is artificially lower than it would have been in the marketplace.

72.     By failing to represent realistic marketplace conditions and artificially reducing exposure to Brooks' use of "nitro", the Butler Survey artificially reduced the survey measure of likelihood of confusion.  This makes the survey flawed and unreliable, and the survey measure biased in favor of Brooks.

### III.     The Butler Survey includes an unreliable control that inflates the control measure and suppresses the net measure of confusion.

73.     Survey responses may be affected by a number of factors.  One such factor may be the disputed element, which in the Butler Survey is Brooks' use of "nitro" on its webpage.  However, there are other reasons why respondents might provide false positive measures, or select answers counted as confusion that are not caused by Brooks' use of "nitro".  The Butler Report mentions some of these survey biases, including "guessing, inattention, pre-existing beliefs, or other factors not at issue in the litigation."[62]  False positive measures of confusion may also be caused by biases including demand effects,[63] yea-saying,[64] response order bias,[65] or other factors.

---

[62] Butler Report, p. 17.

[63] A demand effect is bias caused by respondents trying to provide socially acceptable answers or answers they believe would be helpful to the survey sponsor or researcher.  *See* Joseph F. Hair et al.  *Marketing Research: In a Digital Information Environment*.  McGraw-Hill Irwin, 2009, p. 284.

[64] Yea-saying bias, or acquiescence bias, can be caused by the possible tendency of survey respondents to agree with survey questions presented in certain formats, such as "yes" and "no" response options.  *See*, Baumgartner, Hans, and Jan-Benedict E.M. Steenkamp.  "Response Styles in Marketing Research: A Cross-National Investigation."  *Journal of Marketing Research*, vol. 38, no. 2, May 2001, pp. 143–156.

[65] Response order bias can be caused by the order in which responses are displayed.  For example, some respondents might select the first or last response from a list simply because it was listed first or last.  *See* Alreck, Pamela L., and Robert B. Settle.  *The Survey Research Handbook*.  Irwin, 1995, p. 103.

74.    The use of a control can allow a survey to measure "general background noise,"[66] and isolate the effect associated with the disputed elements.  Even the Butler Report acknowledges this, stating, "It is standard practice, therefore, for survey researchers to use a control stimulus to measure the extent to which survey noise is affecting the desired estimate."[67]

75.    According to the *Reference Guide on Survey Research*, "In designing a survey-experiment, the expert should select a stimulus for the control group that shares as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[68]  That authoritative guidance states that, "the control stimulus [must not] share with the experimental stimulus the feature whose impact is being assessed.  If, for example, the control stimulus in a case of alleged trademark infringement is itself a likely source of consumer confusion, reactions to the experimental and control stimuli may not differ because both cause respondents to express the same level of confusion."[69]

76.    The control used in the Butler Survey violates this authoritative guidance.

77.    The Butler Survey purports to test Brooks' use of "nitro".  As a control, the Butler Survey "replaced 'nitro' with the word 'nitrogen.'"[70]  Since "nitrogen" includes the disputed word "nitro," "nitrogen" violates the authoritative standard that a control must not "share with the experimental stimulus the feature whose impact is being assessed."[71]

---

[66] McCarthy, J. Thomas.  § 32:187 "The need for a survey control." *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-552.

[67] Butler Report, pp. 17-18.

[68] Diamond, Shari Seidman.  "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 399.

[69] Diamond, Shari Seidman.  "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, pp. 399-400.

[70] Butler Report, p. 18.

[71] Diamond, Shari Seidman.  "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 399.

78.    Because of its use of this flawed control, respondents in the test and control groups in the Butler Survey were essentially exposed to nearly-identical stimuli.  It is the flawed control and the lack of substantive difference between the test and control words "nitro" and "nitrogen" that is the real cause of the survey's low net measure, and not any lack of consumer confusion.

79.    Even Ms. Butler implies that the control is unreliable.  She wrote, "To ensure that my Test results were driven solely by the use of 'nitro,' I removed references to 'nitrogen' that appear elsewhere in the advertisement."[72]  This appears to be tacit admission that consumers would have difficulty discerning between "nitrogen" and "nitro," and therefore makes "nitrogen" an unreliable control that violates the standards set forth in the *Reference Guide on Survey Research*.

80.    Additionally, arguments made by Brooks suggest that the "nitrogen" control is unreliable.  I understand that Brooks has provided certain dictionary definitions to support its argument that "nitro" is just a short form of "nitrogen."[73]  Therefore, by Brooks' reasoning, the Butler Survey's control is unreliable.

81.    Some authorities argue that a high control measure can indicate a flawed control.  As one authority notes, "it seems preferable that controls not yield confusion or deception estimates that exceed 10 percent or perhaps 12 percent."[74]  While that same authority acknowledges that the stated 10% to 12% level is not a strict threshold, the source indicates that a high noise measure raises a concern that a control may be too similar to the disputed element being tested, and therefore unreliable.

82.    The "nitrogen" control in the Butler Survey causes the survey to generate a high control measure.  The control measure in the Butler Survey is 36.0%, which far exceeds the 10% to 12% level that may raise doubt regarding the reliability of a control.  It is that high control

---

[72] Butler Report, p. 16, FN 23.

[73] PUMANITRO-048317, PUMANITRO-048318, and PUMANITRO-048319.  I am not providing an opinion that Brooks is correct or that the three dictionary definitions it has provided support its opinion.  I merely point out the inconsistency between Brooks' arguments and Ms. Butler's reliance on a control, "nitrogen," that Brooks claims is synonymous with the test, "nitro."

[74] Jacoby, Jacob.  "Settings, Stimuli, and Tasks." *Trademark Surveys: Designing, Implementing, and Evaluating Surveys*, Vol. 1.  ABA Publishing, 2013, p. 527.

1   measure due to the unreliable "nitrogen" control that is responsible for reducing the Butler

2   Survey's very substantial 41.5% measure of confusion with "nitro" to the low net measure of

3   confusion provided in the Butler Report.[75]

4   83.     The Butler Survey's inflated control measure is not caused by true survey noise, but

5   rather by the use of an unreliable control that violates authoritative standards.

6

7   **IV.     The Butler Survey includes a flawed universe that is under-inclusive with**

8   **respect to the product category, over-inclusive with respect to time, and fails**

9   **to represent the relevant consumer population.**

10  84.     One important element of survey design is ensuring that the universe of survey

11  respondents represents the consumer population at issue.  According to *McCarthy on*

12  *Trademarks and Unfair Competition*, "Selection of the proper universe is a crucial step, for even

13  if the proper questions are asked in a proper manner, if the wrong persons are asked, the results

14  are likely to be irrelevant."[76]

15  85.     To measure likelihood of confusion, "The appropriate universe should include a fair

16  sampling of those purchasers most likely to partake of the alleged [infringer's] goods or

17  services."[77]

18  86.     The survey universe in the Butler Survey is under-inclusive with respect to the product

19  category.[78]

20

21

22  [75] Butler Report, p. 29, Table 5.

23  [76] McCarthy, J. Thomas.  § 32:159 "Relevant 'universe' surveyed - Defining the universe."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-438.

24  [77] *See Amstar Corp. v. Domino's Pizza, Inc.* 615 F.2d 252, 264 (5th Cir. 1980), cited in Barber, William G. and Giulio E. Yaquinto.  "The Universe."  *Trademark and Deceptive Advertising Surveys: Law,*

25  *Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann.  ABA Publishing, 2022, p. 33.  This refers to the survey universe for a survey measuring "forward" confusion.

26  [78] "A universe may be improperly under-inclusive by defining a group narrower than the ideal universe,

27  thus leaving out a group of persons whose perception is relevant."  McCarthy, J. Thomas.  §32:161 "Relevant 'universe' surveyed - Examples of inappropriate universe."  *McCarthy on Trademarks and*

28  *Unfair Competition*, 5th ed., Thomson Reuters, 2021, p. 32-446.

Expert Rebuttal Report of Dr. Justin R. Anderson
                                                        Case No. 2:23-cv-00116-LK

87.    The product category at issue is running shoes, and arguably running shoes priced at $100 or more.[79]  Rather than qualifying on purchase of "running shoes" at a relevant price, the Butler Survey described the product category as "performance running shoes."[80]

88.    There are many consumers who may purchase running shoes priced at $100 or more but don't consider them "performance" running shoes.  The Brooks website does not describe its shoes as "performance" running shoes.  In fact, the word "performance" does not appear at all on the Brooks webpage that uses "nitro."[81]  The product webpage for Brooks Glycerin 21 women's running shoes does not use the word "performance."[82]  The product webpage for Brooks Caldera 6 women's running shoes also does not use the word "performance."[83]  The product webpage for Brooks Hyperion Tempo women's running shoes uses the word "performance" once, in relation to "comfort."[84]

89.    Many consumers may purchase running shoes for their comfort and would not necessarily describe them as "performance running shoes."  By qualifying respondents narrowly as purchasers of "performance running shoes," the Butler Survey disqualified consumers who are potential purchasers of the relevant type of running shoes, but do not describe them the way they were characterized in the Butler Survey.

---

[79] As part of my research in this matter, I have seen Brooks running shoes on sale for less than $100 on the Brooks website, which was the basis for the Brooks stimulus in the Butler Survey.  However, I have not criticized the price threshold used in the Butler Survey.

[80] Questions S11 and S14, Butler Report, Exhibit D, pp. 3-4.

[81] "Nitro-Infuse Your Run."  *Brooks Running*, www.brooksrunning.com/en_us/run-on-nitro/.  Accessed January 20, 2024.

[82] "Glycerin 21 Women's Running Shoe."  *Brooks Running*, www.brooksrunning.com/en_us/glycerin-21-womens-neutral-cushioned-running-shoe/120408.html.  Accessed January 20, 2024.

[83] "Brooks Caldera 6 Women's Long Distance Trail Running Shoes."  *Brooks Running*, www.brooksrunning.com/en_us/caldera-6-womens-distance-trail-running-shoe/120366.html?dwvar_120366_color=096. Accessed January 20, 2024.

[84] "Brooks Hyperion Tempo Women's Running Shoes for Training."  *Brooks Running*, www.brooksrunning.com/en_us/hyperion-tempo-womens-running-shoes/120328.html. Accessed January 20, 2024.

90.     Demographic evidence supports my contention that the Butler Survey's description of the product category as "performance running shoes" does not reflect consumer understanding of the category.  Table F below shows the age distribution for consumers who purchase the relevant type of running shoes and respondents in the Butler Survey.

**Table F:  Age Distribution of Consumers Who Purchase the Relevant Type of Running Shoes and Respondents in the Butler Survey**

| Age Distribution[85] | Relevant Consumer Population[86] | Butler Survey Respondents[87] |
|---|---|---|
| Baby Boomers (ages 60 and older) | 9.0% | 9.5% |
| Generation X (ages 46 to 59) | 45.0% | 21.5% |
| Millennials (ages 27-45) | 36.0% | 53.8% |
| Generation Z (ages 18-26) | 10.0% | 15.3% |

91.     Table F shows that the Butler Survey under-represents Generation X (21.5% of respondents) by approximately half of its proportion of the relevant population of consumers (45.0% of relevant consumers).  Conversely, the survey over-represents Millennials (53.8% of respondents) by one-and-a-half times their proportion of the relevant consumer population (36.0% of relevant consumers).

92.     This significant age skew and failure of the survey to properly reflect the age profile of the relevant consumer population may reflect the survey's description of the product category as "performance running shoes," instead of "running shoes."  That is, consumers in different generational cohorts may describe or understand the relevant product category using different terms.  This may explain why the age distribution in the Butler Survey does not match the age distribution of relevant consumers.  Had the survey not used the word "performance," perhaps the survey universe would have better reflected the age profile of relevant consumers.

---

[85] These generational cohorts may be defined by slightly different age ranges in different sources. Adjusting the ages by one or two years in each direction would not have a substantial effect on the results of the comparison provided in Table F.

[86] According to information conveyed to me in a phone call with PUMA staff.

[87] Excel file "Exhibit H to Butler Report - Running Final 12.14.23."

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

93.     Because the survey universe is under-inclusive with respect to the product category, it fails to represent the opinions of consumers who are members of the relevant consumer population but who didn't meet the survey's improperly narrow qualification criteria.

94.     The survey universe in the Butler Survey is also over-inclusive[88] with respect to the time period of purchase.

95.     A survey intended to measure likelihood of confusion should include respondents who are likely to purchase the relevant goods in the future.  As one Court noted, "It is well-established that only potential future purchasers, not past purchasers, are relevant to a confusion study."[89]

96.     In violation of this established standard, 84.3% of respondents in the Butler Survey were included in the survey because they indicated that they purchased performance running shoes priced at $100 or more in the "past twelve months" (emphasis added).[90]  Only 15.8% of respondents were qualified as likely to purchase performance running shoes priced at $100 or more in the "next six months" (emphasis added).[91]

97.     Because running shoes are a durable product that may last a long time, consumers who purchased running shoes priced at $100 or more within the past twelve months may be inferred to be unlikely to purchase running shoes priced at $100 or more in the next six months.  Therefore, the vast majority of consumers included in the Butler Survey are not only unknown to meet the proper qualifications for inclusion in the survey universe, but may actually be unlikely to meet those proper qualifications because of their recent past purchase.

---

[88] "A universe may be improperly over-inclusive by encompassing such a large group of persons that it includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data." McCarthy, J. Thomas.  § 32:161 "Relevant 'universe' surveyed - Examples of inappropriate universe."  *McCarthy on Trademarks and Unfair Competition*, 5th ed., Thomson Reuters 2021, pp. 32-443 to 32-444.

[89] *Louis Vuitton Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 604 (S.D.N.Y. 2007).

[90] Butler Report, p. 25.

[91] Butler Report, p. 25.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

98.    I understand that PUMA's NITRO running shoes may last typical consumers for approximately 200 to 500 miles,[92] and that typical consumers of PUMA NITRO shoes may purchase running shoes every six to twelve months.  It would be a mistake to assume that respondents who qualified for the Butler Survey because they purchased "performance running shoes" priced at $100 or more in the past year would also be likely to purchase such shoes in the next six months.

99.    While some may assume that past purchase behavior may predict future purchase behavior, that is not necessarily the case.  There may be many reasons why a consumer who purchased "performance running shoes" priced at $100 or more in the past year would not be likely to purchase such shoes in the next six months.  The consumer may be dissatisfied that their shoes didn't last longer and may no longer be willing to pay a premium for shoes they believe aren't more durable or longer-lasting.  The consumer may no longer be interested in running, or no longer interested in "performance running," and doesn't need "performance running shoes." The consumer's financial situation may have changed, and they may no longer be able or willing to spend $100 or more on a pair of "performance running shoes."  Or other reasons may make respondents unlikely to purchase "performance running shoes" priced at $100 or more in the next six months.

100.   Rather than make assumptions about respondents' future purchase likelihood, the Butler Survey could – and should – have measured them by asking all respondents whether they are likely to purchase "performance running shoes" priced at $100 or more in the next six months. Instead, the Butler Survey relies mostly on past purchase behavior, which does not necessarily indicate future purchase likelihood.

101.   Because the survey universe is over-inclusive with respect to the time period of purchase, it includes the opinions of consumers who are not members of the relevant consumer population but who met the survey's improperly broad qualification criteria.

---

[92] PUMANITRO_013581 to _013587.

Expert Rebuttal Report of Dr. Justin R. Anderson
Case No. 2:23-cv-00116-LK

1

**V.**    **The Butler Survey employs a method to test for reverse likelihood of**

2       **confusion and fails to test for the forward likelihood of confusion that has**

3       **been alleged in this matter.**

4    102.    I understand that PUMA has alleged forward likelihood of confusion in this matter, such

5    that when consumers encounter Brooks' use of "nitro", they would mistakenly believe that

6    Brooks shoes "originate from PUMA, or are associated or connected with PUMA, or have the

7    sponsorship, endorsement, or approval of PUMA."[93]

8    103.    In a two-room Squirt survey to measure forward likelihood of confusion, respondents are

9    first shown the senior user's mark, in order "to make the allegedly infringed brand accessible" in

10   respondents' memories.  Then, the senior user's mark is removed from view, and respondents are

11   shown the junior user's disputed use in a lineup that includes distractor marks that are not at

12   issue in the matter.  The survey then asks questions regarding which items in the lineup are from

13   or affiliated with the senior user.[94]

14   104.    In violation of this standard, the Butler Survey reverses the order of the senior and junior

15   users.  The survey first showed Brooks' use of "nitro".  Then, the survey displayed a product

16   webpage for PUMA Velocity NITRO 2 Men's Running Shoes in the lineup with the product

17   webpages for the distractor Nike and HOKA shoes.

18   105.    This backwards order resembles how a survey might test for reverse likelihood of

19   confusion but fails to properly test for forward likelihood of confusion.

20   106.    In fact, the reverse ordering of the survey negates the use of the distractors, as well as any

21   interpretation of the survey results for the distractors.  In a properly-ordered two-room Squirt

22   survey that measures forward likelihood of confusion, the survey would measure confusion

23   between each distractor and the senior user.  In violation of this standard, the Butler Survey

24   measured confusion between each distractor and the junior user, Brooks.  That makes no sense in

25

26   [93] Amended Complaint, p. 16.

27   [94] Swann, Jerre B.  "Likelihood of Confusion Surveys and the Straitened Scope of Squirt." *The Trademark Reporter*, vol. 98, no. 3, 2008, pp. 749-750.  *See also* Swann, Jerre, B.  "Eveready and Squirt

28   – Cognitively Updated."  *The Trademark Reporter*, vol. 106, no. 4, pp. 739-740.

the context of the forward likelihood of confusion allegation in this matter and makes the distractors worthless for interpreting the results of the Butler Survey.

107.    By failing to follow the proper method for measuring forward likelihood of confusion, the Butler Survey fails to properly measure the likelihood of confusion that is at issue in this matter.  Even if the other serious flaws in the survey were ignored, the Butler Survey simply fails to measure the kind of likelihood of confusion that is relevant to this dispute.

**Conclusions**

108.    Based on my review of the Butler Report, my review of other materials identified in this report, and my experience, I believe that the Butler Survey is significantly flawed and unreliable. The Butler Survey is unable to provide a reliable measure of likelihood of confusion in this matter for the following reasons:

    i.    The Butler Survey failed to remove initial respondents whose responses bias the reported survey results in favor of Brooks.

    ii.    The Butler Survey inhibits exposure to Brooks' use of "nitro" and fails to represent realistic marketplace conditions.

    iii.    The Butler Survey includes an unreliable control that inflates the control measure and suppresses the net measure of confusion.

    iv.    The Butler Survey includes a flawed universe that is under-inclusive with respect to the product category, over-inclusive with respect to time, and fails to represent the relevant consumer population.

    v.    The Butler Survey employs a method to test for reverse likelihood of confusion and fails to test for the forward likelihood of confusion that has been alleged in this matter.

109.    These are significant flaws in the design and execution of the Butler Survey that make the Butler Survey unreliable and unable to provide valid or reliable measures of use, association, or influence.

1    I declare under penalty of perjury under the laws of California that the foregoing is true and correct

2    to the best of my belief.

3

4    Executed in Encino, California, on February 6, 2024.

5

6

7    _____

8                      Dr. Justin R. Anderson

**Exhibit 1:**
**Dr. Justin R. Anderson CV and Testimony Experience**

**MMR STRATEGY GROUP**
*Creating growth through customer insight.™*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • www.mmrstrategy.com

# Dr. Justin R. Anderson, MBA, PhD

<u>**Summary of Qualifications**</u>

- Expertise in marketing and survey research.
- Experience in intellectual property matters.
- Doctorate, University of Southern California; MBA, University of Illinois; Bachelor of Science, University of Wisconsin.

---

**MMR Strategy Group**, Encino, CA
**Senior Vice President**                                2020 – Present
**Vice President**                                        2014 – 2019

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and prospective customers.  MMR has three primary practice areas:

1. <u>Marketing Research and Consulting</u>:  MMR provides marketing research and consulting to help clients improve products, and develop marketing and sales strategies.

2. <u>Litigation Surveys</u>:  MMR provides surveys and testimony for intellectual property matters.  MMR has been retained by firms including Jones Day, Proskauer Rose, and others.  MMR has also been retained by government agencies, including the Department of Justice and the Federal Trade Commission.

3. <u>Claim Substantiation</u>:  MMR provides research and consulting to help clients evaluate claims made in packaging, advertising, and other marketplace communications.

- As Senior Vice President, I design surveys, manage research projects, and provide consulting for clients.  I have conducted hundreds of surveys during my career.

- I have conducted surveys and provided rebuttals to surveys for intellectual property litigation and claim substantiation matters.

- I have published peer-reviewed articles in academic journals and conferences of the American Marketing Association.  I have presented invited lectures to other groups.  I write on topics relating to marketing and survey research.

---

## Education

- Doctor of Philosophy (**PhD**) in Business Administration (concentration in Marketing), **University of Southern California**, 2007.  Awarded Doctoral Fellowship.

- Master of Business Administration (**MBA**) (concentration in Marketing), **University of Illinois**, 2001.  Graduated with Academic Excellence.

- Bachelor of Science (**BS**) in Atmospheric Science, **University of Wisconsin**, 1995.

## Prior Professional Experience

**Lieberman Research Worldwide**, Los Angeles, CA                     2012 – 2014
**Research Director**

**MMR Strategy Group**, Encino, CA                                   2011 – 2012
**Research Director**

**California State Polytechnic University, Pomona**, Pomona, CA       2010 – 2011
**Visiting Professor of Marketing**

**University of North Carolina Wilmington**, Wilmington, NC           2007 – 2010
**Assistant Professor of Marketing**

**University of Southern California**, Los Angeles, CA               2005 – 2006
**Instructor of Marketing**

**University of Southern California**, Los Angeles, CA               2002 – 2004
**Research Fellow**

**BBDO Chicago**, Chicago, IL                                        2001 – 2002
**Senior Research Analyst**

**United States Air Force**, Various Locations                       1996 – 1999
**Meteorological Office**


## Honors and Awards

- Named an Impact Professor, University of North Carolina Wilmington, 2008, 2009, 2010
- Winner, American Marketing Association Best Lecture Slide Competition, Brands and Branding category, 2008
- Winner, American Marketing Association Best Lecture Slide Competition, Society and Marketing category, 2008
- Excellence in Teaching Award, Marketing Department, Marshall School of Business, University of Southern California, 2005 – 2006
- Doctoral Fellowship, Marshall School of Business, University of Southern California, 2002 – 2007
- MBA Graduate with Academic Excellence (top 15% of class), 2001
- Inducted into Beta Gamma Sigma business honor society, 2001

## Professional Memberships and Organizational Service

- Member, The Trademark Reporter Committee, International Trademark Association, 2024 – Present

- Member, Insights Association, 2017 – Present

- Member, International Trademark Association (INTA), 2014 – Present

- Member, Brand Activation Association (BAA), 2014 – Present

- Member, Association of National Advertisers (ANA), 2014 – Present

- Member, American Marketing Association (AMA), 2002 – Present

- Editorial Board, Journal of Brand Strategy, 2014 – 2023

- Reviewer, Journal of Brand Management, 2011 – 2023

- Survey Expert, Commercialization of Brands Committee, International Trademark Association, 2020 – 2021

- Reviewer, Arts and the Market (formerly Arts Marketing), 2011 – 2021

- Member, Non-Traditional Marks Committee, International Trademark Association, 2016 – 2017

- Member, Marketing Research Association (MRA), 2014 – 2016

- Member, Faculty Teaching Committee, College of Business, California State Polytechnic University, Pomona, 2010 – 2011

- Faculty Advisor, Pi Sigma Epsilon professional sales fraternity, California State Polytechnic University, Pomona, 2010 – 2011

- Chair, Scholarship Committee, Cameron School of Business, University of North Carolina Wilmington, 2009 – 2010

- Faculty Advisor, Student Veterans Organization, University of North Carolina Wilmington, 2008 – 2010

- Member, Military Task Force, University of North Carolina Wilmington, 2008 – 2010

- Member, Scholarship Committee, Cameron School of Business, University of North Carolina Wilmington, 2008 – 2009

- Reviewer, Atlantic Marketing Association Conference, Consumer Behavior/Marketing Research track, 2008

- Reviewer, Society of Consumer Psychology Doctoral Dissertation Proposal Competition, 2008

- Member, Faculty Growth and Development Committee, Cameron School of Business, University of North Carolina Wilmington, 2007 – 2009

- Reviewer, Marketing Science, 2006 – 2007

**Publications and Public Speaking Engagements**

- "Litigation Surveys," guest lecture for an Intellectual Property Law class at George Washington University Law School. February 23, 2022.
- "Litigation Surveys for Trade Dress:  Measuring Likelihood of Confusion, Secondary Meaning, and Genericness for Trade Dress Litigation," moderation of a roundtable discussion, INTA Annual Meeting. November 17, 2021.
- "Surveys for Trademark Litigation:  What Every Trademark Attorney Should Know About Conducting and Rebutting a Trademark Survey," moderation of a roundtable discussion, INTA Annual Meeting. May 21, 2019.
- "Litigation Surveys for Non-Traditional Marks," presentation to the U.S. Subcommittee of the INTA Non-Traditional Marks Committee, September 2016.
- "Using Surveys in Intellectual Property Matters," Continuing Legal Education (CLE) seminar presented to the Bar Association of San Francisco, October 2015.
- Anderson, Justin (2011), "Measuring the Financial Value of Brand Equity: The Perpetuity Perspective," Journal of Business Administration Online, 10 (1), 1-11.
- "Brand Equity: The Perpetuity Perspective," Presented to AMA Winter Educators' Conference, 2007.
- "Entertainment Expectations: How Affective Forecasting and Regret Cause Consumers to Prefer Familiar Mediocrity Over Superior Novelty," Presented to Houston Doctoral Symposium, 2006.
- "Entertainment Consumption: How Entertainment Goods Give the People What They Want," Presented to AMA Winter Educators' Conference, 2006.

**Blog Posts Written for www.MMRStrategy.com**

**Marketing and Marketing Research**
- "Is Your Brand Loyalty Immune to COVID-19?" (May, 2020)
- "Can You Measure a Longitudinal Variable in a Cross-Sectional Survey?" (July, 2015)
- "Three Questions to Ask Before Introducing a Brand Extension" (January, 2015)
- "Is Your Country Brand Name Expansionist or Isolationist?" (December, 2014)
- "Are In-Person Surveys Better Than Online Surveys?" (November, 2014)

**Advertising Claim Substantiation Surveys**
- "Don't Play Games with 'Made in the USA' Advertising Claims" (October, 2018)
- "When Not To Conduct an Advertising Claim Substantiation Survey" (August, 2018)

**Litigation Surveys**
- "When Do You Need a False Advertising Survey" (September, 2015)
- "Three Essential Elements of a Genericness Survey" (November, 2014)

**MMR**

## Undergraduate and MBA Marketing Courses Taught

- Business Research Methods
- Buyer Behavior
- Consumer Behavior
- Marketing Intelligence and Communication
- Marketing Research
- Marketing Strategy
- Marketing the Movies
- Principles of Marketing

## Selected Topics of Study in MBA and PhD Programs

- Research Methods and Research Design:  Doctoral research seminars focused on buyer decision making, consumer psychology, individual choice modeling, marketing management, marketing strategy modeling, and research design and measurement

- Statistics:  Doctoral-level courses in probability and statistics focused on comparing groups, hierarchical linear modeling, linear regression analysis, multivariate analysis techniques, and structural equation modeling

- Marketing:  Consumer Behavior, Customer Marketing, Global Marketing, Marketing Management, Marketing Research, Marketing Strategy, Pricing, Promotion Management

- Management:  Business Strategy, Corporate Strategy, International Business, Strategic Theory

- Communications, Psychology and Sociology:  Communications Theory, Organization Theory and Design, Organizational Behavior

- Economics and Finance:  Capital Market Environment. Financial Accounting, Game Theory, Macroeconomics, Managerial Accounting, Managing Cash Flows, Microeconomic Theory, Microeconomics

**Dr. Justin R. Anderson Litigation Expert Witness Experience**
**February 2024**

Cases in which Dr. Justin R. Anderson has testified as an expert, including written expert reports or testimony at deposition or trial, in the past four years.

**Evolve Biosystems, Inc., and The Regents of the University of California v. Abbott Laboratories**
United States District Court, Northern District of Illinois
Retained by Defendant

**In the Matter of Certain Portable Battery Jump Starters and Components Thereof (The NOCO Company v. Shenzhen Carku Technology Co., Ltd. et al.)**
United States International Trade Commission
Retained by Respondents

**Edible IP, LLC v. 1-800-FLOWERS.COM, INC**
United States District Court, Northern District of Georgia
Retained by Defendants

**Aman Group, S.á.r.l. v. Aman Spirits LLC**
United States District Court, Central District of California
Retained by Defendants

**Snap Inc. v. Katherine K. Vidal and the United States Patent and Trademark Office**
United States District Court, Central District of California
Retained by Defendants

**Vampire Family Brands, LLC v. RiGO Trading, S.A., and Haribo of America, Inc.**
United States District Court, Central District of California
Retained by Defendants

**Lettuce Entertain You Enterprises, Inc. v. Summer House LLC**
United States District Court, Northern District of Ohio
Retained by Plaintiff

**Maestro Tequilero, S.A. de C.V. v. Gildardo Partida Hermosillo**
United States Patent and Trademark Office, Trademark Trial and Appeal Board
Retained by Registrant, Gildardo Partida Hermosillo

**Top Tobacco, L.P. v. ShenZhen Woody Vapes Technology Co. Ltd.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board
Retained by Opposer, Top Tobacco, L.P.

**Lettuce Entertain You Enterprises, Inc. v. Siesta Key Summer House LLC**
United States District Court, Middle District of Florida
Retained by Plaintiff

**Salutare S.A. de C.V. v. Remedy Drinks Pty Ltd.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board
Retained by Opposer, Salutare S.A. de C.V.

**Power Home Remodeling Group, LLC v. Power Home Solar LLC**
United States District Court, Eastern District of Pennsylvania
Retained by Defendant

**Vital Pharmaceuticals, Inc. d/b/a Bang Energy; JHO Intellectual Property Holdings v. PhD Marketing, Inc.**
United States District Court, Central District of California
Retained by Plaintiff

**Elevate Federal Credit Union v. Elevations Credit Union**
United States District Court, District of Utah
Retained by Plaintiff

**Gaby's Bags, LLC v. Mercari, Inc.**
United States District Court, Northern District of California
Retained by Defendant

**Blackstone International, Ltd. v. Costco Wholesale Corporation**
United States District Court, Western District of Washington at Seattle
Retained by Defendant

**Country Life, LLC v. The Hain Celestial Group, Inc.**
United States District Court, Eastern District of New York
Retained by Defendant

**MMR**